804 A.2d 507

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANTHONY DIFRISCO, DEFENDANT–APPELLANT.

Argued March 26, 2002—Decided August 14, 2002.

198

200

*Lawrence S. Lustberg* and *Jean D. Barrett,* Designated Counsel, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney; *Mr. Lustberg, Ms. Barrett* and *Jessica A. Roth,* of counsel and on the briefs).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

This is a capital case. This Court previously affirmed defendant's conviction for capital murder, *State v. DiFrisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990) (*DiFrisco I*), upheld his death sentence, *State v. DiFrisco,* 137 *N.J.* 434, 645 *A.*2d 734 (1994) (*DiFrisco II*), and determined that his sentence was not disproportionate when compared to similar cases, *State v. DiFrisco,* 142 *N.J.* 148, 662 *A.*2d 442 (1995) (*DiFrisco III*). Defendant now appeals the trial

court's denial of his petition for post-conviction relief (PCR) in which he asserts that he was denied effective assistance of counsel during the penalty phase of trial. We affirm.

## I.

### Facts and Procedural History

In what this Court has described correctly as a "cold-blooded, execution-style killing," *DiFrisco I, supra,* 118 *N.J.* at 256, 571 *A.*2d 914, defendant murdered Edward Potcher, the owner of Jack's Pizzeria, at his Maplewood restaurant on August 12, 1986. Defendant fired four bullets into the victim's head and a fifth bullet into his body. Defendant confessed to the homicide after being arrested in New York on unrelated charges. Defendant also admitted that a man named Anthony Franciotti paid him $2500 to commit the murder. The other facts relating to our previous decisions are set forth at length in *DiFrisco I, supra,* 118 *N.J.* at 255–60, 571 *A.*2d 914, *DiFrisco II, supra,* 137 *N.J.* at 448–51, 645 *A.*2d 734, and *DiFrisco III, supra,* 142 *N.J.* at 157–59, 662 *A.*2d 442. We recite only those facts relevant to defendant's PCR petition or as necessary background to our disposition.

### A.

### The Homicide and the First Penalty Trial

Defendant and Franciotti had met in a New York prison approximately two years before the shooting, when defendant was in his early twenties and Franciotti was in his fifties. Franciotti befriended defendant after defendant arrived at the prison and remained friendly with him during the period that their sentences overlapped. The two men spent a great deal of time together, often eating meals together and talking to each other, and remained in touch after Franciotti's release. When defendant was released on parole, he visited Franciotti often and relied on him for narcotics to support his drug habit.

One night in the summer of 1986, Franciotti told defendant that someone was planning to accuse Franciotti and his associates of illegal drug activity, and that he wanted to have that person killed. Franciotti asked defendant to commit the homicide. Defendant responded that he had never killed anyone before, but he agreed to do what Franciotti asked. Defendant later explained why he acceded to Franciotti's request, "I mean I owed [Franciotti] money. You know, I kind of looked up to the man and I guess like, rather than see him go to prison and that I owed him money and I was getting my drugs from him, I said yes."

On the night of the murder, Franciotti picked up defendant in the Bronx and took him to a bar for a few drinks. Because defendant was nervous, Franciotti bought him some heroin. After defendant ingested the drug, he felt better and told Franciotti, "If we are going to do this, let's get it over with." Franciotti then drove defendant from New York to Jack's Pizzeria in Maplewood. Defendant went into the pizzeria while Franciotti waited in the car. Defendant ordered a whole pizza because Jack's did not sell slices, and took a few bites from one slice. After a delivery person left the store to make a delivery, defendant asked Potcher for some water. As Potcher turned, defendant shot him five times at close range, using a gun with a silencer. Defendant then returned to Franciotti's car. The day after the killing, Franciotti paid defendant in cash. Defendant later used the money to visit his sister in New Mexico.

Potcher's murder remained unsolved until April 1, 1987, when New Jersey authorities were alerted to defendant's confession to the crime. Defendant had been arrested in New York for car theft and reckless endangerment, and he told a New York detective that he wished to cooperate to get out of the charges. The detective suggested that defendant provide information about a more serious crime. Defendant asked the detective, "who is more guilty, a guy who shoots a guy or a guy who pays him to shoot the guy?" The detective replied, "A guy who pays him to shoot the guy ... The guy who killed the guy is only an intermediate, only a

pawn." Defendant admitted killing someone in a pizzeria in New Jersey, but offered few details. The detective contacted New Jersey authorities, who identified an unsolved murder in Maplewood that fit the offense described by defendant. Within hours, the Maplewood police and Essex County homicide officers arrived at the New York precinct.

Defendant recounted details of the crime to the New Jersey authorities. Defendant also gave a taped statement and signed a confession implicating Franciotti. Several days later, New Jersey authorities made arrangements for defendant to make a recorded telephone call to Franciotti, to connect Franciotti to the murder. A public defender with whom defendant consulted advised him to make the call. Defendant ultimately refused to call Franciotti, explaining that defendant's father advised him not to cooperate further with the police without the advice of paid counsel.

Defendant was indicted for capital murder and weapons charges. He entered a guilty plea and waived a jury for his sentencing trial. At the first sentencing trial, the trial court found two aggravating factors: that defendant was a hired killer, *N.J.S.A.* 2C:11–3c(4)(d), and that he killed to avoid the detection of another, *N.J.S.A.* 2C:11–3c(4)(f). The court found as a single mitigating factor that defendant cooperated with authorities in the prosecution of another person for murder, *N.J.S.A.* 2C:11–3c(5)(g). Finding that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, the trial court sentenced defendant to death. For reasons not relevant here, this Court overturned the death sentence in *DiFrisco I, supra,* and remanded the matter for a new sentencing trial. 118 *N.J.* at 283, 571 *A.*2d 914.

### B.

### Representation Prior to Sentencing Retrial

On remand, defendant's attorney, Samuel DeLuca, moved for a directed verdict of life imprisonment. DeLuca argued that no

additional evidence existed to corroborate the aggravating factors that gave rise to the death sentence. The trial court denied the motion, and the Appellate Division declined to grant leave to appeal. In September 1991, defendant wrote a letter to the court, requesting appointment of new counsel. Defendant expressed his dissatisfaction with DeLuca's representation. The court allowed DeLuca to withdraw from the case and, in his stead, ordered the Public Defender to represent defendant.

The Public Defender's Office assigned Assistant Deputy Public Defenders Barbara Lapidus and Michelle Soto to the case. Lapidus, who was assigned as lead counsel, had no experience in capital cases but was a seasoned public defender. Soto also had no experience trying capital cases, and had only two years experience trying criminal cases. Lapidus and Soto were chosen because attorneys with previous capital experience were already engaged in other death penalty cases. Lapidus was initially reluctant to defend a capital case, but her supervisor, Joseph Krakora, chief of the homicide division, expressed confidence that she could do the job. He also assured her that Soto would do the necessary legal writing. The supervisor talked to them about the case and made himself available for questions and discussions.

### 1. The Motions to Withdraw Defendant's Guilty Plea

Prior to the sentencing retrial, Lapidus and Soto filed two motions to withdraw defendant's guilty plea. In the first motion, counsel argued that defendant's guilty plea should be withdrawn because his decision to plead was rendered involuntary by DeLuca's erroneous assurances that defendant would receive a life sentence. Counsel's subsequent motion was based on the ground that defendant's plea resulted from ineffective assistance of counsel.

In support of both motions, counsel presented the testimony of defendant and DeLuca. In essence, counsel argued that DeLuca did not develop mitigation evidence on defendant's behalf because he was convinced that defendant would not receive the death penalty. According to counsel, DeLuca so grossly misinformed

defendant regarding the consequences of pleading guilty that defendant did not enter his plea knowingly and voluntarily. The trial court denied both motions, finding that DeLuca had not misled defendant nor made any improper promises. The court also found that DeLuca's decision not to investigate had been reasonable. This Court ultimately affirmed the trial court's determination on both motions in *DiFrisco II, supra,* 137 *N.J.* at 451–59, 645 *A.*2d 734.

## 2. The Mitigation Investigation

Counsel began their mitigation investigation about the time that they had begun preparing the motions to withdraw defendant's guilty plea. They retained a licensed psychologist, Dr. Ronald Silikovitz; a psychiatrist specializing in substance abuse, Dr. William Annitto; and a mitigation specialist, Cessie Alfonso. They also requested the assistance of an investigator at the Public Defender's Office, Pam Cuevas. Toward the end of the investigation, counsel asked a different mitigation specialist, Carmeta Albarus, to take the place of Alfonso. Finally, counsel retained Dr. Peter Schiffman, a psychiatrist, as an expert witness on drug abuse.

Although Dr. Silikovitz had never worked on a capital case before participating in defendant's case, his specialties included psychological testing, behavior modification, and neglected children. He had experience with child welfare cases involving the Division of Youth and Family Services. Krakora approved retention of Dr. Silikovitz to evaluate defendant for purposes of the motion to withdraw defendant's guilty plea. Counsel did not provide Dr. Silikovitz with the legal standards for plea withdrawal. However, to assist him in his task, counsel provided Dr. Silikovitz with their case report, the incident report, and the transcripts of the guilty plea and original sentencing hearing.

Silikovitz met with defendant for three hours, and he performed a number of tests, including a WAIS–R for intellectual evaluation, H–T–P, D–A–P, Projective Drawings, Bender, Rorscharch, WRAT, sentence completion, TAT, and Three Wishes. Dr. Siliko-

vitz delivered his first report to defense counsel on February 25, 1992, several months prior to the hearings for both motions to withdraw defendant's guilty plea. The report discussed defendant's overall psychological status and reported defendant's account of his confession to authorities.

Dr. Silikovitz stated that defendant could not "recall any phase of the confession process" because "he was high on cocaine and probably also heroin at the time when the 'confession' was made." The report indicated that several people, including defendant's mother and his attorney, witnessed defendant's condition. The report also indicated that defendant "manifests guilt and remorse related to his history of criminal and drug activity." The report observed, "One has the sense that [defendant] may be more of a follower and a victim of circumstance rather than an individual who tends to initiate, originate, and create difficulty." Based on Dr. Silikovitz's three-hour meeting with defendant, the psychologist diagnosed defendant with antisocial personality disorder (ASPD) and multiple drug dependencies.

Soto believed that Dr. Silikovitz's report was harmful to defendant's case, particularly the ASPD diagnosis. Krakora, Soto's supervisor, agreed. Lapidus, on the other hand, felt that the diagnosis, viewed in conjunction with the entire report, was not too damaging. Notwithstanding Soto's and Krakora's doubts, Lapidus asked Dr. Silikovitz to evaluate and assess possible mitigating factors. Dr. Silikovitz met with defendant a second time, again for three hours. Dr. Silikovitz relied on defendant's own reasons why he should not be put to death. After defendant's interview, counsel gave Dr. Silikovitz a copy of the statutory aggravating and mitigating factors used in capital cases and told him to call either Lapidus or Cuevas, the investigator, if he had any questions.

Dr. Silikovitz met with counsel, conducted telephone interviews with four family members and defendant's former girlfriend, and reviewed the Diagnostic and Statistical Manual of Mental Disorders, revised third edition (DSM–III–R). He then produced a

revised report. He changed his ASPD diagnosis to a diagnosis of "Adult Antisocial Behavior." Dr. Silikovitz's revised report also provided greater detail regarding defendant's remorse for his crime; included information about defendant's broken home, lack of supervision, and need for male role models, all of which were linked to defendant's history of substance abuse; discussed at length defendant's drug abuse and addiction; and included some of defendant's positive character traits.

Lapidus liked the revised report because it conveyed defendant's remorse, his regard for Franciotti as a father figure, and his susceptibility to Franciotti's influence because of his drug dependency and need for a male role model. Soto, however, was "adamant" that Dr. Silikovitz should not be called as a witness because of the initial ASPD and revised "Adult Antisocial Behavior" diagnoses. As for Dr. Silikovitz himself, the two lawyers also differed. Lapidus felt that he was genuine, that he cared for defendant, that he was credible, and that those qualities would come across to the jury. Soto, on the other hand, felt that the doctor was inarticulate and unclear. Dr. Silikovitz met with counsel twice after completing his revised report.

Dr. Annitto, a board-certified psychiatrist with expertise in the field of substance abuse, met with defendant and submitted a brief report to counsel addressing defendant's drug use at the time of his confession. Dr. Annitto concluded that defendant's use of cocaine, Valium, and heroin would have had a dramatic impact on his physical condition at the time of his arrest and confession. The report further concluded that defendant would have been suffering severe withdrawal by the time of his confession, which would have led him to "say just about anything so as to get some relief and peace." Because defendant described his symptoms of withdrawal without any prompting from Dr. Annitto, the doctor found defendant's account to be credible.

Counsel also retained Alfonso Associates, a consulting firm that specializes in, among other things, the collection and presentation of psychosocial mitigation evidence. Cessie Alfonso, who ran the

firm, was highly regarded in the Public Defender's Office. Counsel asked Alfonso to evaluate defendant's history, background, and family relationships for mitigation purposes. Soto told Alfonso to obtain as much information as possible, even if "bad," because it might be useful in developing some mitigating factors. Soto also asked Cuevas, who had worked at the Public Defender's Office for about a year, to conduct her own investigation of defendant's background. Although counsel met with Cuevas to discuss the case, they did not direct Alfonso on how she should focus her investigation. Lapidus and Soto later testified that they relied on Alfonso's expertise and, therefore, did not feel the need to supervise her.

Alfonso never saw Dr. Silikovitz's reports, and the work of Alfonso Associates and Cuevas was never shared with Dr. Silikovitz. Lapidus later testified that the reports were never shared because they were being prepared "contemporaneously." Alfonso, however, testified that had she seen Dr. Silikovitz's report during her investigation, she would have done substantially more research into defendant's relationship with Franciotti, defendant's need for a father figure, the losses that occurred during defendant's childhood and adolescence, defendant's depression, and defendant's remorse. Likewise, Dr. Silikovitz later testified that had he received defendant's school records incorporated in the Alfonso report, he would have conducted further testing because the records indicated a learning disability.

Cuevas reviewed all available discovery and set up appointments to interview a number of witnesses. She interviewed defendant and spoke to his relatives. She obtained defendant's prison records from the State and from the Essex County jail. The investigator also received some of defendant's school records, and she interviewed defendant's former girlfriend. However, defendant's stepmother, Janet DiFrisco, made it difficult to involve defendant's half-sister, Theresa, in the investigation. Although Theresa was supposedly close to defendant and Soto felt that she might be helpful to the defense, she did not testify. Soto decided

not to subpoena Theresa because counsel did not know what she would say at the retrial.

In June 1992, Alfonso Associates sent defense counsel an initial report prepared by Alfonso and two associates, one of whom was Carmeta Albarus. The report revealed that defendant's father was emotionally unavailable, that his mother was depressed and unable to provide discipline, and that defendant received little attention or family support. The report also provided information about defendant's drug use, and stated that defendant was exposed to drug use in the home at a young age. Finally, the report noted that defendant never had appropriate male role models, and that his father's neglect led to defendant's lack of self-esteem.

In October 1992, Lapidus expressed dissatisfaction about working with Soto (the disagreement over Dr. Silikovitz helped put a strain on their relationship). Krakora then removed Soto from the case and assigned Peter Liguori to replace her. Soto and Liguori had similar legal backgrounds at the Public Defender's Office.

In November 1992, Alfonso notified defense counsel that, due to health problems, she would be unable to testify at the sentencing retrial. She recommended Billy Feinberg, a social worker with experience testifying in capital cases, to replace her. Also in November, approximately six weeks before the sentencing retrial, Lapidus resigned from the Public Defender's Office. Krakora asked Soto to resume work on the case as lead counsel and to try the case with Liguori. Krakora later testified that he had decided to reassign Soto to the case because the presiding judge was strictly enforcing court deadlines, and Soto was the only person with knowledge of the case who was in a position to take over.

Soto and Liguori decided that Carmeta Albarus, one of Alfonso's associates, would testify in place of Alfonso. Although Albarus had no experience testifying, counsel felt that she would be a satisfactory witness. They believed that she came across as a genuine, warm person, and other attorneys in the Public Defender's Office agreed that Albarus would be the more appropriate

choice. Albarus had no contact with defense counsel prior to November 1992. Liguori later testified that they rejected Alfonso's recommendation to call a different witness, Billy Feinberg, because Feinberg did not know defendant's case and Albarus did.

In December 1992, defense counsel's focus turned toward preparing Albarus to testify. Albarus conducted re-interviews of several people so that she would have personal knowledge of the individuals and the information in Alfonso's report. Also, Alfonso Associates prepared a second report that incorporated the information gained from those additional interviews. The cover letter to the second report stated that the report's substance bore "no significant changes and the themes and issues remain consistent" with the first Alfonso report.

After becoming lead counsel, Soto decided not to call Dr. Silikovitz to testify. She believed that the expected benefits of the doctor's testimony were outweighed by his diagnosis of ASPD. Additionally, in a conversation with Soto, Dr. Silikovitz described defendant as a "sociopath." Soto feared that the jury would reject defendant's mitigation defense if it heard that defendant suffered from ASPD, or if it heard him labeled a "sociopath." Soto considered replacing Dr. Silikovitz, but ultimately rejected that idea because she could not be sure what another expert might say about ASPD. Counsel thought that stressing defendant's drug addiction and family background would be a better approach under the circumstances.

Soto decided to call Dr. Peter Schiffman as an expert witness on drug abuse and its effects on a person's judgment. Soto chose to limit the scope of Dr. Schiffman's testimony to the effects of drug abuse in general. She believed that she had to confine his testimony so that the court would not disallow it entirely (the discovery deadlines had long passed), and because defense counsel had not uncovered sufficient evidence to corroborate defendant's specific claim that he was using drugs at the time of the offense.

## C.
### The Sentencing Retrial

The sentencing retrial lasted five days, one day of which was devoted to defendant's mitigation case. Two expert witnesses testified, Albarus and Dr. Schiffman. Also, defendant's sister, father, brother, and mother testified.

Albarus testified as a mitigation specialist, stating that she performed a psychosocial assessment of defendant. She narrated his family background and history of drug abuse. Albarus also briefly discussed defendant's relationship with Franciotti. On cross-examination, the prosecutor attempted to discredit Albarus by bringing out the fact that she did not have an undergraduate degree in psychology, did not have any advanced degree beyond the undergraduate level, and lacked training in substance abuse. The prosecutor also highlighted the fact that Albarus had never before testified in court, and that her report was very similar to the prior report submitted by Alfonso.

With regard to Dr. Schiffman's testimony at the sentencing retrial, Soto recounted that his testimony was "devastating to [defendant's] defense." Soto noted that the doctor's testimony, which deviated from that which Soto had anticipated, "made it look like [defendant] was a danger." For example, Dr. Schiffman told the jury that heavy cocaine use usually leads to paranoia, followed by "out and out psychosis," and that a cocaine addict may even be driven to the point of "hurting people trying to get [drugs]." One of Soto's supervisors testified that he would not have agreed to present Dr. Schiffman as a witness.

Members of defendant's family testified. They recounted defendant's unhappy home, his father's neglect, and his drug abuse.

After both sides had rested, defendant made a brief statement to the jury asking the members to spare his life. Outside the jury's presence, counsel engaged in a colloquy with the court about whether defense counsel would be permitted to allude to defendant's remorse. Counsel intended in their summation to

submit defendant's remorse to the jury as a mitigating factor. The court told counsel that it was considering striking remorse as a mitigating factor because "there's no evidence of it." The only suggestion of remorse, the court observed, was in defendant's statement to the jury. Defense counsel objected, stating that "remorse is one of the central themes of our defense."

The court ultimately ruled that "although it may be a stretch, the jury may infer the continuing presence ... of remorse from the prior statements [the confession] and prior testimony, if they so wish." In closing, Soto did argue defendant's remorse by contending that defendant's confession to an otherwise unsolved murder should weigh heavily against the death penalty, as well as defendant's cooperation with the police. Finally, Soto spoke of defendant's drug use and how that affected Franciotti's influence over defendant.

In its verdict, the jury found unanimously that the first aggravating factor, that the murder was for pecuniary gain, had been established beyond a reasonable doubt. The jury did not unanimously find, and therefore rejected, the existence of the second aggravating factor, that the murder was committed for the purpose of escaping detection for another crime.

As reflected on the verdict form, the jury's findings on mitigation were as follows:

a. The defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution[.]

(12) No (0) Yes

b. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution[.]

(12) No (0) Yes

c. The defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder[.]

(6) No (6) Yes

d. The childhood and upbringing of Anthony DiFrisco.

(0) No (12) Yes

e. Anthony DiFrisco suffered from his father's lack of love, recognition and attention.

(0) No (12) Yes

f. Anthony DiFrisco's mother was unable to provide him with the discipline and guidance he needed while growing up.

(0) No (12) Yes

g. Anthony DiFrisco could not turn to his two older brothers for guidance and support because they were drug abusers.

(0) No (12) Yes

h. Anthony DiFrisco never developed any self-esteem.

(0) No (12) Yes

i. Anthony DiFrisco's emotional maturity level was stunted due to his early addiction to drugs.

(0) No (12) Yes

j. Anthony DiFrisco's excessive drug abuse affected his ability to make sound judgments.

(8) No (4) Yes

k. Anthony DiFrisco was vulnerable and susceptible to the older Franciotti because he looked up to him as a father figure.

(0) No (12) Yes

l. Anthony DiFrisco was dependent upon Franciotti for drugs.

(11) No (1) Yes

m. Anthony DiFrisco allowed himself to be manipulated by Anthony Franciotti.

(0) No (12) Yes

n. Anthony DiFrisco's motivation in confessing to the murder was remorse.

(12) No (0) Yes

o. Anthony DiFrisco remains remorseful about killing Edward Potcher.

(11) No (1) Yes

p. Edward Potcher's killing would have remained unsolved, if Anthony DiFrisco himself had not confessed.

(0) No (12) Yes

q. Any other factor which is relevant to the defendant's character or record or to the circumstances of the offense.

(12) No (0) Yes

As indicated, one or more jurors found thirteen of the mitigating factors. Of those thirteen, the jury found nine factors unanimously, including that defendant's emotional maturity level was stunted due to drug addiction, that defendant was vulnerable and susceptible to Franciotti, that defendant allowed himself to be manipulated by Franciotti, and that the murder itself would have

remained unsolved had defendant not confessed. The jury concluded that it was "unanimously satisfied" that the one aggravating factor outweighed the mitigating factors beyond a reasonable doubt. Consequently, the trial court sentenced defendant to death.

## D.

### The Petition for Post–Conviction Relief

In February 1997, defendant filed the present petition for PCR alleging that he had been denied the effective assistance of counsel and of experts at his sentencing retrial. Defendant also sought the court's permission for leave to interview jurors from the sentencing retrial, based on unsolicited information provided by an alternate juror. That information, according to defendant, suggested that the jury had received extraneous information and attempted to return a non-unanimous verdict. Defendant also sought an evidentiary hearing in which he would have the opportunity to present testimony by factual witnesses and four expert witnesses retained by PCR counsel. The newly-retained experts, defendant argued, conducted the thorough, competent investigation that should have been conducted by defense counsel at the penalty retrial.

First, defendant sought to introduce the testimony of Alan M. Goldstein, Ph.D., a forensic psychologist, who conducted twenty-six hours of interviews with defendant, interviewed family and friends, and administered a set of psychological tests. Dr. Goldstein concluded that defendant was and is remorseful and does not suffer from ASPD. Dr. Goldstein also found that defendant suffers from a learning disability, Attention Deficit/Hyperactivity Disorder (ADHD), which, combined with years of substance abuse, explained his poor judgment and excessive reliance on others in social situations. Finally, in his report, Dr. Goldstein discussed the ways in which, in his opinion, Dr. Silikovitz's evaluation of defendant was incomplete and inadequate as compared to the standard of care of a competent psychologist.

Second, defendant sought to introduce the testimony of Wilfred Van Gorp, Ph.D., a neuropsychologist. Dr. Van Gorp concluded that defendant had suffered from ADHD since childhood, and his abilities were further diminished by years of substance abuse. Dr. Van Gorp concluded that defendant's impairments made it difficult for him to make sense of social situations, and resulted in his being excessively influenced by mentor-type figures like Franciotti.

Third, defendant sought to present the testimony of Robert L. Smith, Ph.D., a psychologist with an expertise in the diagnosis and treatment of substance abuse. Dr. Smith evaluated the effects of defendant's drug abuse on his cognitive functioning and concluded that, at the time of the offense, defendant's ability to appreciate the wrongfulness of his actions was diminished due to his substance abuse. Dr. Smith further concluded that defendant's cognitive capacity was severely impaired at the time of his confession, due to the combination of withdrawal from heroin and acute cocaine intoxication.

Fourth, defendant sought to introduce the testimony of Jill Miller, a mitigation specialist, who completed a comprehensive psychosocial history of defendant. Miller found defendant to be remorseful, a conclusion supported by her interview with Sister Gnam, a prison chaplain who met with defendant many times and reported that defendant was remorseful. Based on interviews with people who have known defendant throughout his life, Miller concluded that defendant was capable of rehabilitation. In addition, Miller evaluated the mitigation investigation conducted by the defense counsel for retrial and concluded that it was inadequate and deficient.

Finally, defendant sought to introduce the expert report and testimony of David I. Bruck, an attorney with expertise in capital litigation. In his report, Bruck stated that his analysis of defendant's case led him to conclude that retrial counsel's performance fell well below national standards for capital defense counsel.

The PCR court accepted into evidence the above reports prepared by the new experts, with the exception of Bruck's report. The court declined to hear in-court testimony from any of those experts or their sources. Instead, the court heard testimony from defendant's previous experts, and from the lawyers who represented defendant at his sentencing retrial and their supervisors. The PCR court denied defendant's motion to interview jurors.

After all witnesses had testified, defendant argued six points of ineffective assistance of counsel. The court denied defendant's petition. As to all but one issue, the court found that retrial counsel's performance had been reasonable. The sole issue on which the court found deficient conduct was the second motion to withdraw defendant's guilty plea. On that issue, however, the court held that defendant had not been prejudiced by counsel's performance. Defendant also contended that he was deprived of his constitutional right to the effective assistance of experts, and that the death penalty is unconstitutional. The court ruled that both claims were beyond the scope of the PCR hearing.

Defendant appeals to this Court as of right. *R.* 2:2–1(a)(3).

## II.

### Standard of Review

The legal principles governing our review may be stated briefly. In *Strickland v. Washington,* the United States Supreme Court set forth the applicable test for determining whether a criminal defendant has received effective assistance of counsel as required by the Sixth Amendment to the United States Constitution. 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). First, counsel's performance must fall "below an objective standard of reasonableness." *Id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. That prong is satisfied when counsel's acts or admissions fall "outside the wide range of professionally competent assistance" considered in light of all the circumstances of the case. *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. Second, there must be a

"reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. That prong is satisfied when counsel's errors are sufficient to undermine confidence in the outcome of the trial. *Ibid.*

This Court adopted the *Strickland* formulation in *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). We concluded:

> Even if we are not constitutionally compelled to adopt the *Strickland* [ ] test, the development of the law in this area impels us to conclude that we should recognize the soundness and efficacy of both the substance and formulation of this federal Constitutional standard in defining our own State Constitutional guarantee of effective assistance of counsel. We therefore hold that under Article I, paragraph 10 of the State Constitution a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated.

> [*Id.* at 58, 519 *A.*2d 336.]

In *State v. Davis,* this Court applied the *Strickland* standard to the guilt phase of a capital trial. 116 *N.J.* 341, 356–57, 561 *A.*2d 1082 (1989). We reasoned that the standard was the appropriate test, stating:

> Capital defendants are guaranteed competent capital counsel. Obviously the measure of an advocate's competency depends on the task to be accomplished. The best intentions and the most devoted of efforts do not necessarily equate with capital competence. We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases. The *Strickland/Fritz* standard demands no less.

> [*Id.* at 356, 561 *A.*2d 1082.]

In *State v. Marshall,* the Court differentiated the prejudice prong of the *Strickland* standard when evaluating counsel's performance at the penalty phase. 148 *N.J.* 89, 250, 690 *A.*2d 1 (1997) (*Marshall III*). We concluded that a capital defendant may demonstrate prejudice by showing a "reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Ibid.* Thus, a capital defendant does not need to show that the result of the penalty phase would have been different, as in a non-capital proceeding, but rather "that the omitted information would have

substantially affected the jury's deliberations during the penalty phase." *State v. Bey*, 161 *N.J.* 233, 252, 736 *A.*2d 469 (1999).

We further explained that "[t]he reasonable probability that ineffective assistance of counsel in the penalty phase of a capital case substantially affected the jury's penalty-phase deliberation equates with 'a probability sufficient to undermine confidence in the outcome.'" *Marshall III, supra*, 148 *N.J.* at 250, 690 *A.*2d 1 (quoting *Strickland, supra*, 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). Within the context of this petition, the relevant inquiry under the prejudice prong is whether defendant's argument in respect of mitigation, as well as his other asserted errors, undermines the Court's confidence in the outcome of the penalty-phase deliberations. *Ibid.*

■ Ultimately, a defendant must satisfy both prongs of the *Strickland/Marshall* test before a court will set aside a capital sentence on grounds of ineffective assistance of counsel. *Strickland, supra*, 466 *U.S.* at 697, 104 *S.Ct.* at 2069, 80 *L.Ed.*2d at 699; *Marshall III, supra*, 148 *N.J.* at 251, 690 *A.*2d 1. Within that framework, a defendant is entitled to competent counsel, not perfect counsel. *Kokoraleis v. Gilmore*, 131 *F.3d* 692, 696 (7th Cir.1997) (observing that "Constitution is satisfied when the lawyer chooses a professionally competent strategy that secures for the accused the benefit of an adversarial trial"). Additionally, this Court has noted that "[m]erely because a trial strategy fails does not mean that counsel was ineffective." *Bey, supra*, 161 *N.J.* at 251, 736 *A.*2d 469.

■ Lastly, a reviewing court must assess the performance of counsel with a "'heavy measure of deference to counsel's judgments.'" *State v. Martini*, 160 *N.J.* 248, 266, 734 *A.*2d 257 (1999) (quoting *Strickland, supra*, 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Accordingly, "when counsel's decision to limit an investigation is supported by 'reasonable professional judgments,' we will not find deficient performance." *Ibid.* (internal citation omitted). We likewise noted in *Marshall III, supra*, that "'[j]udicial scrutiny of counsel's performance must be highly deferential.'

... [A court] must avoid second-guessing defense counsel's tactical decisions and viewing those decisions under the 'distorting effects of hindsight.'" 148 *N.J.* at 157, 690 *A.*2d 1 (quoting *Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694).

### III.

We now consider defendant's claims. Defendant argues that counsel at the sentencing retrial was ineffective because: (1) they failed to present available evidence of defendant's remorse, (2) they failed to present available evidence of defendant's relationship with Franciotti and its role in the crime, (3) they failed to present evidence of defendant's positive character attributes and rehabilitative potential, (4) their cumulative errors at the sentencing retrial prejudiced defendant, (5) they failed to pursue defendant's cooperation with the State, and (6) their performance on the motions to withdraw defendant's guilty plea prejudiced defendant.

Defendant also appeals the PCR court's exclusion of the experts' in-court testimony, the refusal to consider the report of David Bruck, and the denial of the motion for leave to interview the jurors from the sentencing retrial. Finally, defendant argues that he was deprived of his constitutional right to the effective assistance of experts, and that the death penalty is unconstitutional. We conclude that even if defendant's claims of counsel error have merit under *Strickland/Marshall's* first prong, we are satisfied that such errors did not substantially affect the jury's penalty-phase deliberations. We further conclude that no asserted error on the part of the PCR court warrants reversal of that court's ultimate disposition.

### A.

### Ineffective Assistance of Counsel

### 1. Evidence of Defendant's Remorse

Defendant first argues that he received ineffective assistance of counsel at his sentencing retrial when counsel failed to discover

and present evidence of his remorse. The evidence to which defendant refers is both information that counsel possessed at the time of retrial and information gathered by Dr. Goldstein and Jill Miller, the mitigation specialist, for this PCR petition. Specifically, defendant contends that retrial counsel was incompetent for failing to replace Dr. Silikovitz with a new psychological expert; that counsel failed to present relevant expressions of remorse by defendant that were in their possession, namely, Dr. Silikovitz's reports and Carmeta Albarus's interview notes; and that counsel was incompetent for failing to instruct Alfonso, the mitigation specialist, to investigate remorse.

The State counters that retrial counsel did present evidence of remorse but strategically chose not to present Dr. Silikovitz as a witness. Although the Silikovitz report referred to defendant's remorse, other aspects of it would have devastated the defendant's mitigation case. The State also argues that counsel was not obligated to seek another expert witness to testify about defendant's remorse. More fundamentally, the State disputes the power of remorse evidence, arguing in essence that because anyone can express regret, such evidence has a limited impact on a jury.

The State also points out that Albarus testified at the PCR hearing that she knew that she was supposed to testify about remorse at the retrial. Thus, contends the State, counsel was not responsible if Albarus's testimony was deficient on the issue of remorse. The State further notes that defendant cannot demonstrate any prejudice from counsel's failure to present greater evidence of remorse under the second prong of *Strickland/Marshall.*

The PCR court found that counsel did not overlook remorse at retrial, and that counsel was not ineffective in its presentation of remorse. The court noted that Dr. Goldstein's and Jill Miller's reports, although impressive, reflected the same "dilemma" faced by retrial counsel regarding Dr. Silikovitz's report. The dilemma was that every piece of good information about defendant seemed

to carry with it bad information. Consequently, the court concluded that it was reasonable for counsel to choose not to call Dr. Silikovitz as a witness.

The PCR court also found that although Dr. Silikovitz may not have performed a comprehensive battery of tests on defendant, he did assure counsel that he had conducted all necessary tests. Therefore, the court concluded, it was reasonable for counsel to rely on those assurances and to decide not to replace Dr. Silikovitz with another expert.

The PCR court explained:

> The record in this case is not one in which trial counsel completely omitted to conduct any factual investigation of potential mitigation. A number of experts were utilized in the investigation of mitigating factors although they were not called to testify as witnesses at the trial.

> . . . .

> The presumption of prejudice is reserved for those cases where there has been a complete denial of counsel. Counsel's performance in this case is not deserving of that judgment. Remorse was an issue that was submitted to the jury in the manner described previously in this record. The jury rejected that evidence, obviously, not convinced that the defendant was remorseful at the time of his arrest and confession. Additional evidence of remorse elicited many years after the fact would not likely be more convincing.

We agree. As a general principle, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Martini, supra,* 160 *N.J.* at 266, 734 *A.*2d 257 (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Consistent with that duty, retrial counsel engaged the services of a psychologist, two psychiatrists, a mitigation specialist, and an investigator from the Public Defender's Office. Those professionals may have lacked specific experience with New Jersey's capital sentencing system, but they assisted counsel in exploring how to present a sympathetic portrait of defendant to the jury. That was a difficult task given the calculating, brutal nature of defendant's crime.

Further, counsel argued remorse in both the opening argument and summation, and asked the retrial jury to consider two mitigat-

ing factors on remorse. Specifically, Soto argued to jurors that it was illogical to believe that defendant confessed to escape a short jail term for car theft; rather, he "did it because the remorse is overwhelming. That's why he confessed. He had to get it off his chest. He had to clean the slate." In addition, counsel reached out to defendant's family and presented their testimony at the sentencing retrial.

Based on the information generated through the experts and investigators on the case, retrial counsel made a reasonable, tactical decision not to call Dr. Silikovitz. To defendant's benefit, that decision shielded the jury from the diagnoses and other negative information that the Silikovitz reports revealed about defendant. That counsel decided not to replace Dr. Silikovitz with a new psychological expert is understandable given the fact that Dr. Silikovitz assured counsel that he had performed all the necessary tests and interviews on defendant. Dr. Silikovitz had diagnosed defendant with ASPD and then modified that to "Adult Antisocial Behavior." Thus, counsel would have been reasonable in expecting that another expert would have arrived at a like conclusion.

Although there may be an occasion when the choice not to replace an expert would indicate a fatally inadequate investigation, counsel's decision not to replace Dr. Silikovitz was within an appropriate range of discretion. See *McDowell v. Calderon*, 107 *F*.3d 1351, 1362 (9th Cir.), *superceded in part on other grounds*, 130 *F*.3d 833 (9th Cir.1997), *cert. denied*, 523 *U.S.* 1103, 118 *S.Ct.* 1575, 140 *L.Ed.*2d 807 (1998) (finding no ineffective assistance when counsel chose not to call any mental health experts because one of three expert witnesses prepared report with extremely damaging information). Moreover, we are not persuaded that defendant's new experts could have avoided the admission of damaging information about defendant. The reports of the new experts, Dr. Goldstein and Dr. Smith, both indicate that defendant suffers from a personality disorder with "antisocial" traits. The

Goldstein report recounts defendant's perspective on the murder, which reflects negatively on defendant:

> [Defendant] stated, "Did I do it smartly? Yes; it was unsolved. Obviously I did it okay. Did I understand why? People don't understand this.... It's just not real, especially when he [the victim] looked at me and I'm thinking I don't know him; he's a rat guy telling on Tony [Franciotti] and he's dealing drugs too and he wants to put us—Tony and the guys away—in my mind, I'm not just walking in and killing an innocent person. He's doing what Tony is doing and he got caught and now wants to tell on Tony." According to [defendant], "I'm looking at him. He looks nice, but he's also a scumbag and he's selling drugs and he's telling on Tony and I'm thinking about my mother—like a thousand times a minute."
>
> . . . .
>
> When asked whether he was struggling with his thoughts, [defendant] replied, "I'd be lying if I said my conscience but I didn't do anything like this before. I can't explain it. I felt nothing ... blank; just had to shoot [him] to make my life easier."

We are satisfied that had retrial counsel replaced Dr. Silikovitz, they would have been faced with the same or similar damaging information that led them to forego calling Dr. Silikovitz in the first instance.

▮ Defendant, therefore, has not satisfied the first prong of *Strickland/Marshall.* Even if we were to conclude otherwise, we are confident in our view that defendant has not met that test's second prong. The jury found the murder-for-hire aggravating factor based on evidence that reflected the nature and brutality of defendant's crime. Moreover, defendant remained silent about the murder for eight months, confessing only after he had been arrested on unrelated charges in a different state. Lastly, had Dr. Silikovitz been replaced by Dr. Goldstein, the jury would have been exposed to defendant's statements, reflected in the Goldstein report, that he considered Potcher to be a "rat guy" and "scumbag" and that he killed him to "make my life easier." Those statements demonstrate how extremely difficult it would have been to convince jurors of defendant's purported contrition. Under those circumstances, we are satisfied that some greater portrayal of defendant's remorse would not have significantly affected the jury's deliberations.

## 2. Evidence of Defendant's Relationship with Franciotti

Defendant next argues that the "real" story of how defendant came to commit the murder was not told to the jury because counsel had failed to develop evidence of defendant's dependence on Franciotti. Defendant adds that counsel failed to present to the jury a coherent narrative of how and why Franciotti grew to occupy such an important role in defendant's life. Before the PCR court, defendant attempted to demonstrate his dependence on Franciotti by presenting evidence of his troubled family life, his long history of drug abuse, his desperate need for a father figure, his neurological impairments, and the numerous traumatic losses in his life. According to defendant, that evidence explained why he had committed murder at Franciotti's behest.

Defendant contends that retrial counsel essentially was aware of that evidence and that further investigation would have led them to learn of defendant's ADHD, later diagnosed by Dr. Goldstein, and the tragic loss of loved ones during his childhood and teenage years. Though defendant concedes that retrial counsel presented evidence of defendant's dependency on Franciotti, defendant argues that such testimony was minimal and insufficient to justify defendant's apparent willingness to kill for Franciotti.

The PCR court found that the testimony presented at the sentencing retrial painted a picture of defendant's background and home life, including his lack of a father figure and his drug use. According to the court, the evidence that PCR counsel presented was not new and was, at best, cumulative. The court concluded that the fact that more could have been done to present mitigation evidence does not establish ineffective assistance of counsel.

We reason similarly. There is no serious dispute that retrial counsel presented evidence about defendant's relationship with Franciotti, and that that relationship weighed heavily in defendant's commission of the murder. Additionally, retrial counsel presented testimony of defendant's difficult personal life and history of drug abuse, and portrayed defendant as Franciotti's

"victim" in summation. In its brief, the State accurately summarizes that testimony:

At the penalty phase, Carmeta Albarus spoke of defendant's strained relationship with his father and defendant's attempts to look for a replacement. With regard to Franciotti, Albarus testified that they met at a penitentiary in New York State. When she asked defendant what attracted him to Franciotti, defendant answered that Franciotti had a "presence" about him, that he was strong and intelligent and reminded defendant of his father except that Franciotti listened to him which defendant's father did not do. Because of that quality, defendant formed a close relationship with Franciotti who told him that when he was released from prison, he could "check him [out]." That dependence on Franciotti deepened when Franciotti provided him with drugs for sale which defendant used himself. Defendant was nervous about telling Franciotti that he had used the drugs that he was supposed to sell. However, Franciotti told defendant not to worry and gave him more drugs. Eventually, defendant became totally and completely addicted to drugs. When asked to assess defendant, Albarus indicated that because he was deprived of nurture, guidance and emotional stability which he needed to become a socialized adult, he could not resist Franciotti.

Fran DiFrisco, defendant's sister, testified that their father was a cold, hard man who did not know how to show love and who had no relationship with defendant. She believed that defendant began to use drugs to get her father's attention because their father only paid attention to his children when they did something wrong. In 1986, while Fran was living in New Mexico, defendant came out to visit her. He was "dressed beautifully" and "really looked good." During his visit, defendant told her about Franciotti. He described Franciotti as wonderful, a man who believed in defendant as a person and was going to give him a good job in the construction industry in New York.

Fred DiFrisco, defendant's brother, testified about his drug addiction, which he attributed to peer pressure and his non-nurturing family life. Fred claimed that while they were growing up, there was no constructive role model to lead the children into adulthood. As for defendant, Fred indicated that he got the "shortest end of the stick" because he had no real relationship with his father and his older brothers were unavailable to teach him positive things.

Albarus also testified about defendant's home life, including how defendant's father abandoned the family to begin a relationship with a younger woman; how defendant's father provided no emotional support, including not showing up for a school concert where defendant performed; of defendant's feeling of abandonment when Fran, his surrogate mother, moved to California and his brothers also left; of defendant's dropping out of school when he was [13] and of defendant's disappointment when, having helped run the flower shop [his father's business] while his father was ill, being told to leave the shop by his father.

Fran also described her father's affair and the negative impact it had on the family. She noted that when defendant was about 6 or 7, at an age when he wanted his father around, defendant's father had a new wife and daughter and had no relationship with defendant. She spoke of how defendant "idolized" his father and how he would cry and ask why his father did not love and want his children

around him. Fran believed that defendant was very hurt by his father. Fran described the drug use in the family by her brothers and revealed an incident in which defendant saw Fred beat Fran up while Fred was high on drugs. Defendant's own drug use was catalogued. Finally, Fran talked about how, when she left home, defendant felt all alone and abandoned.

Fred talked about his drug addiction, which began when he was about 12 and intensified when his father was incarcerated. He mentioned incidents in which both his brother, Richie, and he would use drugs and overdose in the house and be seen by defendant. Fred admitted that because of his drug addiction, he could not be a role model for his brother, as he tried being "on drugs" as much as he could be. During his teen years, defendant started getting involved with drugs, to "stay numb and not feel anything." Once he kicked his drug habit, Fred tried to help defendant but defendant did not listen. When asked why, Fred answered: "[d]rugs does something to you. It numbs you. It separates you from yourself. You don't hear it. You have to be in pain to get help."

■ With regard to the traumatic losses that retrial counsel allegedly did not investigate, the record indicates that neither defendant's family nor defendant mentioned those losses in interviews with the defense team. Counsel cannot be faulted for failing to expend time or resources analyzing events about which they were never alerted. *Fretwell v. Norris*, 133 *F.*3d 621, 627 (8th Cir.), *cert. denied*, 525 *U.S.* 846, 119 *S.Ct.* 115, 142 *L.Ed.*2d 92 (1998). The Court in *Strickland, supra*, observed along those same lines:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.

[466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695–96.]

■ One event known to counsel presented its own problems. Counsel knew that defendant's friend had been shot and paralyzed in connection with a high-speed chase with police in Virginia when defendant was sixteen years old. Counsel reasonably chose not to present that tragic incident to the jury because it also involved defendant. Defendant had driven the car involved in the chase, with his friend as the passenger. Rather than support mitigation,

that incident likely would have placed defendant in a negative light in the jurors' minds.

Counsel's adequate presentation of evidence regarding Franciotti is confirmed by the fact that the jury unanimously found the following mitigating factors: (1) that defendant suffered from his father's lack of love, recognition, and attention; (2) that defendant was vulnerable and susceptible to the older Franciotti, whom he looked up to as a father figure; (3) that defendant allowed himself to be manipulated by Franciotti; (4) that defendant's mother was unable to provide him with the guidance and discipline he needed while growing up; (5) that defendant could not turn to his two older brothers for guidance and support, because they were drug abusers; (6) that defendant never developed self-esteem; and (7) that defendant's emotional maturity level was stunted due to his early addiction to drugs.

Additionally, four jurors found that defendant's excessive drug abuse affected his ability to make sound judgments. While the case for mitigation suggested by PCR counsel may have been more thorough and more cohesive in its presentation, we are persuaded that defendant received adequate representation on this issue.

### 3. Evidence of Defendant's Positive Character Attributes and Rehabilitative Potential

Defendant argues that retrial counsel failed to conduct a reasonable investigation of evidence regarding defendant's positive character traits and rehabilitative potential. Defendant states that he had no history of violent offenses, and had many positive character attributes and a positive record in prison. He cites the positive descriptions provided by witnesses who were interviewed by retrial counsel, namely, defendant's sister, brother, mother, and father. PCR counsel interviewed other persons, such as defendant's elementary school teacher, who characterized defendant in favorable terms. Defendant also submits that his prison records demonstrate his rehabilitative potential.

Defendant contends that the only evidence retrial counsel presented about his positive attributes was the testimony of his siblings. He argues that his counsel failed to investigate thoroughly defendant's background for positive information, and that that failure was objectively unreasonable given the State's attempt to depict defendant as a cold-blooded contract killer.

Defendant, however, acknowledges that retrial counsel directed Cuevas to investigate defendant's adjustment to incarceration over the five years during which he had been incarcerated for this crime. As a result of that investigation, Cuevas found that defendant had been involved in a "sneaker scam," in which he obtained brand-name sneakers and sold them to other prisoners. At the PCR hearing, Soto recalled that defendant described himself as a wild kid whose hobby was stealing cars. Soto also had notes that contained references to defendant shooting someone, and that he was arrested as a juvenile for possessing a gun. In an interview with Albarus, defendant described a long history of stealing cars and characterized his court appearances as a "joke." Soto thus chose to limit presenting good character evidence to avoid the admission of defendant's prior bad acts.

The State argues that retrial counsel presented some positive information, and made a wise tactical decision not to present evidence of rehabilitative potential to avoid opening the door to far more damaging information. Had retrial counsel argued rehabilitation, the State could have responded with defendant's history of criminal activity. In that respect, the State points out that defendant was sentenced to one-and-one-half to three years imprisonment for burglary in 1984, absconded from a work release program for two months in 1985, and killed Edward Potcher shortly after his release from parole.

The PCR court agreed with the State, finding that the new evidence presented by PCR counsel regarding defendant's positive character attributes was not "significantly different than that which was presented at the time of trial," and that "[t]he new evidence is at best cumulative." The PCR court further found

that retrial counsel had made a reasonable, tactical decision to avoid much of the evidence proffered by PCR counsel, because the evidence opened the door to damaging rebuttal evidence.

We concur. Soto, in deciding to limit evidence of defendant's good character, made a strategic decision that was not unreasonable. She wanted to prevent rebuttal evidence of prior bad acts and other damaging testimony, and that tactical decision is entitled to a "heavy measure of deference." *Martini, supra,* 160 *N.J.* at 266, 734 *A.*2d 257.

In *Martini,* the defendant, like defendant here, had argued that his trial counsel's failure to present certain mitigation evidence at the penalty-phase trial constituted ineffective assistance of counsel. *Id.* at 261, 734 *A.*2d 257. The Court rejected that claim, concluding that "[i]n effect, the usefulness of the evidence as mitigation [was] seriously undermined by its unfavorable aspects." *Ibid.* Our rationale for that conclusion informs our decision here:

> We recognize [ ] that the evidence if used would have opened the door to damaging rebuttal evidence by the State. In a penalty-phase trial, the State is entitled to impeach mitigation testimony with relevant evidence of a defendant's past conduct, subject to an instruction that the evidence is admissible only for the limited purpose of rebutting mitigating factors and cannot be used to add to the weight assigned by the jury to the aggravating factors. Even with a limiting instruction, in this case the presentation of evidence of limited mitigating value would have opened the door to powerful countervailing testimony that could have swayed the jury against defendant.
>
> [*Id.* at 261–62, 734 *A.*2d 257 (internal citations omitted).]

In arguing for a contrary conclusion, defendant cites *Collier v. Turpin,* 177 *F.*3d 1184 (11th Cir.1999). In *Collier,* the defendant's sentencing-phase counsel failed to present evidence of the defendant's upbringing, gentle disposition, record of helping families in need, and displays of heroism and compassion. *Id.* at 1202. In addition, trial counsel failed to present evidence that the defendant was suffering from a diabetic seizure at the time of the crimes. *Ibid.* The court found that trial counsel rendered ineffective assistance of counsel because the jury was given the impression that the witnesses "knew little or nothing" about the defendant,

and that counsel had failed to humanize the defendant for the jury. *Ibid.*

*Collier,* however, is distinguishable. In that case, trial counsel presented ten mitigation witnesses in a little more than one hour. *Id.* at 1201. Counsel conducted a cursory examination of the witnesses, a number of whom were questioned merely in respect of the defendant's reputation for truth and veracity. *Ibid.* In contrast, retrial counsel here presented witnesses who gave a detailed account of defendant's background and attempted to "humanize" defendant for the jury. Those efforts are demonstrated by the various mitigating factors the jury identified on its verdict form.

Thus, in respect of defendant's character attributes and rehabilitative potential, we find no deficient performance under *Strickland/Marshall's* first prong and no prejudice under the second prong.

### 4. Cumulative Errors in Mitigation Case

Defendant contends that the cumulative errors that retrial counsel committed in their presentation of mitigation evidence require a new penalty-phase trial. We disagree. In view of our previous analysis, we conclude that defendant has not demonstrated cumulative error. Counsel presented a mitigation case that stressed defendant's childhood, drug use, and dependence on Franciotti, and engaged the assistance of mitigation and psychological experts in an effort to investigate defendant's background. Counsel also made decisions, understandable at the time, to avoid the presentation of evidence that may have led to the revelation of damaging information about defendant.

As important, assuming that retrial counsel had been deficient in one or more areas, we do not believe that the jury's deliberations would have been affected substantially as a result of those deficiencies. "We are unpersuaded that the cumulative force of all the penalty-phase claims is measurably greater than that of the individual claims." *Marshall III, supra,* 148 *N.J.* at 258, 690 *A.*2d 1.

### 5. Counsel's Failure to Pursue Defendant's Possible Cooperation With the State

Defendant next argues that retrial counsel's failure to pursue the possibility of defendant's cooperation with the State in the prosecution of Franciotti constituted deficient performance that prejudiced defendant. Defendant asserts that his first attorney, DeLuca, rejected the State's efforts to secure defendant's cooperation. Defendant contends that retrial counsel's subsequent refusal to explore the possibility of cooperation, even in the absence of an offer of a life sentence, compounded DeLuca's deficiency.

The PCR court summarily dismissed this claim, finding that defendant had made no record to support it. The court noted that DeLuca was not called to testify as a witness at the PCR hearing, and therefore defendant did not meet his burden of proving his entitlement to relief. However, the PCR court did not directly address whether retrial counsel, not DeLuca, rendered ineffective assistance of counsel by failing to pursue defendant's cooperation with the State.

With regard to DeLuca, we have previously determined that his representation of defendant was not constitutionally deficient in relation to his advice that defendant plead guilty. *DiFrisco II*, *supra*, 137 *N.J.* at 459, 645 *A.*2d 734. We now find, as did the PCR court, that no evidence supports a claim that DeLuca rendered deficient representation with regard to defendant's cooperation with the State.

With regard to retrial counsel, the record indicates that defendant repeatedly conveyed to Soto his concerns about being perceived as a "snitch" if he cooperated. The day before opening arguments in the sentencing retrial, Soto and Liguori met with the assistant prosecutor and made clear that defendant would not testify before the grand jury unless the State agreed to a life sentence. Counsel spoke to defendant about this subject before presenting their position to the prosecutor. We are satisfied that counsel had consulted defendant concerning possible cooperation

with the State, and that retrial counsel's representation was neither deficient nor prejudicial.

### 6. Performance on the Motions to Withdraw Defendant's Guilty Plea

Defendant's final ineffective assistance claim centers on retrial counsel's failed effort to withdraw defendant's guilty plea. According to defendant, but for counsel's deficient performance it is reasonably probable that defendant would have been permitted to withdraw his guilty plea and would not have received the death penalty at retrial.

In respect of the first motion to withdraw defendant's guilty plea, counsel asserted that defendant's guilty plea was not knowing and voluntary. Counsel's argument in support of that motion primarily rested on what DeLuca said to defendant, and what defendant understood to be the consequences of his plea. Defendant maintains that retrial counsel's approach was unreasonable because they had evidence, through Dr. Silikovitz's report, that defendant gave excessive deference to authority figures. If that psychological information had been developed appropriately, defendant argues, it would have explained why DeLuca unduly influenced defendant and, consequently, why his plea was not knowing or voluntary. Echoing an earlier argument, defendant contends that counsel's decision not to replace Dr. Silikovitz with another psychologist constituted ineffective assistance of counsel.

In respect of the second motion, counsel argued to the motion court that DeLuca was ineffective in advising defendant to plead guilty because DeLuca did not investigate possible defenses for the case and erroneously assumed that defendant's confession would not be suppressed. Although ample evidence of defendant's drug use at the time of the confession existed prior to defendant's guilty plea, DeLuca failed to uncover it. The motion court denied the second motion, noting that retrial counsel failed to produce the same evidence that they claimed DeLuca had failed to produce:

that defendant was under the influence of drugs at the time of his confession.

Defendant now contends that that evidence was available to retrial counsel at the time of the second motion, as was evidence that defendant was under the influence of drugs at the time of the murder. Defendant thus argues that had retrial counsel presented that evidence in their argument of DeLuca's ineffectiveness at the second motion, defendant would have been permitted to withdraw his guilty plea.

The PCR court rejected both claims relating to defendant's guilty plea. The court found no deficiency in retrial counsel's failure to present evidence of defendant's deference to authority figures. The court noted that the "newly discovered evidence [that defendant was overborne by DeLuca's advice] simply did not overcome the 'formidable barrier' posed by the record made by the trial court[.]" (That record indicates that defendant understood the consequences of his plea.)

The PCR court found as the only deficiency that counsel had failed to present evidence of defendant's drug use at the time of his confession during the second motion. However, the PCR court concluded that had counsel presented that evidence it would not have affected the outcome of the motion. Accordingly, the court held that defendant had not satisfied *Strickland/Marshall's* prejudice standard.

 The law governing admissibility of confessions may be succinctly stated. "A custodial confession is admissible only if there has been a knowing, intelligent, and voluntary waiver of *Miranda* rights." *State v. Cooper*, 151 *N.J.* 326, 354–55, 700 *A.*2d 306 (1997) (citing *Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 707 (1966)). When evaluating voluntariness, a court reviews the totality of the circumstances, including the characteristics of the defendant and the nature of the interrogation. *State v. Miller*, 76 *N.J.* 392, 402, 388 *A.*2d 218

(1978). At the root of the inquiry is whether a suspect's will has been overborne. *Ibid.*

In this case, the record supports the conclusion that defendant's confession was voluntary under applicable standards. After waiving his *Miranda* rights, defendant confessed to the murder, he gave a detailed description of the crime, and he drew a diagram of the pizzeria and its surrounding area. Defendant further recalled that Jack's pizzeria did not sell pizza by the slice. That defendant was able to recount those facts so vividly suggests that he was not unduly impaired when he spoke to the police. Moreover, a detective present at defendant's confession testified that defendant did not appear to be under the influence of drugs when he was speaking to him. Under those circumstances, evidence of defendant's drug use at the time of the confession likely would not have resulted in a favorable disposition on the motion to withdraw the plea.

We thus conclude that the PCR court properly dismissed defendant's ineffective assistance of counsel claims relating to the guilty plea.

## B.

### Exclusion of the PCR Experts' Testimony

Defendant asserts that the PCR court erred in refusing to hear in-court testimony from four experts, Dr. Goldstein, Dr. Van Gorp, Dr. Smith, and Jill Miller. Before the PCR court, counsel asked that the court permit such testimony as well as receive the experts' reports into evidence. Specifically, PCR counsel stated that "the testimony would certainly be within the four corners of the reports, but I'm sure the State would like the opportunity to cross-examine, and—and we would like the opportunity to present their testimony."

After some review of the trial record, the PCR court stated:

I'm now aware of what your experts would say if they had been the experts that were called during the original trial. . . .

> I know that there is now some difference of opinion as to what his true psychological condition was. And quite frankly, if we get past the first prong, [I] could accept that that's what your witnesses would say, and wouldn't need to hear from one of those witnesses. And I could still make a legal ruling.
>
> The point is, do I need them to repeat what I know they're going to say? You couldn't have been more thorough. . . .
>
> [I] don't necessarily know that I need to hear every single person come here and tell me what your best presentation would be. You have done a very, very thorough job on presenting to me what your best case would have looked like.

In challenging the PCR court's ruling, defendant argues that the experts' in-court testimony was necessary for the experts to explain that their findings were significantly different from those presented at the sentencing retrial. The State responds by arguing that, because of their detail, the reports obviated the need for in-court testimony.

We agree with the State. "Ordinarily, the necessity for and admissibility of expert testimony are matters to be determined within the sound exercise of discretion by the trial court." *State v. Berry*, 140 *N.J.* 280, 293, 658 *A.*2d 702 (1995) (citation omitted). Generally, a trial court will admit expert testimony if the subject matter at issue, or its specific application, is one with which an average fact finder might not be sufficiently familiar, or if the trial court determines that the expert testimony would assist it in understanding the evidence and determining facts in issue. *Id.* at 292–93, 658 *A.*2d 702.

We are satisfied the PCR court did not abuse its discretion in excluding the testimony. The experts were offered to show that their findings were significantly different from the findings of the experts at retrial. The PCR court recognized that the purpose of the new expert reports was to demonstrate that which the retrial experts failed to uncover.

Dr. Goldstein's and Miller's reports explicitly state how the performance of the retrial experts allegedly was deficient. With respect to Dr. Silikovitz's evaluation of defendant, Dr. Goldstein expressed his view that Dr. Silikovitz had failed to administer a series of personality tests that are "an *essential* element of a

comprehensive forensic psychological evaluation conducted by the reasonably prudent professional." Similarly, Miller's report extensively details the asserted deficiencies of the Alfonso investigation, noting that "[i]n addition to their failure to interview many potential sources of information, Alfonso Associates made mistakes in the interviews they did conduct, that resulted in their failure to obtain significant and valuable information."

It might have been helpful to the PCR court to hear from the new experts on how their diagnoses and investigations differed from the former experts. In our view, to have permitted the experts to testify would have been preferable. That said, the differences between the new and former experts are clear from the written reports. Indeed, defense counsel acknowledged that "the testimony would certainly be within the four corners of the reports," indicating that those reports covered the subject matter about which the experts would testify. Under those circumstances, the PCR court was within its discretion to rely solely on the experts' written submissions.

## C.

### Refusal to Consider the Report of David Bruck

Defendant argues that the PCR court's denial of his PCR petition must be reversed due to the court's exclusion of the testimony and report of David Bruck, who was offered as an expert in capital defense litigation. The question is whether the PCR court abused its discretion in excluding Bruck's opinion without considering the content of Bruck's report and, if so, whether that error requires reversal of the lower court's ultimate disposition.

Defense counsel argued to the PCR court that Bruck, an attorney with over twenty years of experience working in the area of capital defense, should be allowed to present his opinion on the norms for competent capital defense attorneys prevailing at the time of defendant's sentencing retrial. Counsel argued that the

defense "should be permitted to put an expert on so that a record is made as to the right way to do this." Counsel rejected the State's characterization of Bruck's testimony as calling for a "cookie-cutter approach," but rather described it as outlining "certain fundamentals" of capital defense litigation.

The PCR court declined to consider Bruck's testimony and report, as well as any other testimony from other PCR experts on the proper relationship between capital counsel and defense experts. The court concluded, "I don't need a lecture from a lawyer as to capital presentations. I presided over the cases. You may argue law to me. I can understand that. But I don't need to hear a separate presentation on that subject." The court added that defendant's case is not complicated either in terms of its proofs or presentation, and that if the content of the expert testimony is within the court's knowledge and experience, then there is no requirement to hear it.

We agree with defendant that the PCR court erred when it refused to consider Bruck's opinion. The field of capital defense litigation is a constantly evolving, specialized area of the law. See *Bailey v. State*, 309 *S.C.* 455, 424 *S.E.*2d 503, 507 (1993) (quoting capital defense expert on specialized area of capital litigation). All judges, irrespective of their experience level, can be informed by such information. Thus, when PCR counsel offers that form of testimony in a capital case, the court should hear it or at least consider it in written form.

In this case, however, in view of our earlier conclusion that retrial counsel did not render ineffective assistance of counsel, the PCR court's error was harmless. Significantly, Bruck's report focuses solely on *Strickland/Marshall's* first prong. Because defendant ultimately has failed to satisfy the second prong of the test, Bruck's opinion would not alter our disposition. Thus, no remand or reversal is required in these circumstances.

## D.

### Denial of the Motion for Leave to Interview Jurors

Defendant argues that the denial of his PCR petition must be reversed and his case remanded to the PCR court so that jurors from the sentencing retrial can be interviewed. Defendant maintains that statements made by an alternate juror to counsel indicate that the jurors considered extraneous information and misunderstood the jury instructions.

The facts in respect of defendant's claim are these. Three years after defendant's sentencing retrial, an alternate juror, Margaret Whittaker, stated to defendant's appellate counsel that the jurors "did not want to come down 'that way,' but felt that they had no choice because of the way the judge gave the instructions." Based on that information, defendant moved for permission to interview the jurors. The motion court denied the request, stating that the claim hung "on the thinnest of threads."

Several months later, PCR counsel renewed the motion before the PCR court. Counsel represented in an affidavit that Whittaker called him several times, unsolicited, and provided him with more information about the deliberating jurors. The jurors allegedly relayed to Whittaker that one or more of them believed that: (1) defendant would not be executed, even if sentenced to death, because the appellate process takes so long; (2) defendant was facing serious criminal charges in New York, although the jury was not told of any charges; (3) defendant had visited the victim's pizza parlor on occasions prior to the murder; and (4) during deliberations, one or more jurors believed that to return a life verdict, the jury had to be unanimous for life, and because the jurors would not unanimously find for life, some just went along with the death verdict.

The PCR court denied defendant's renewed motion. The court reasoned that Whittaker was not in the deliberating room, and thus the information was mere hearsay; that Whittaker's communications were "stale" given that Whittaker waited three years to

make her first overture to counsel; that there was no indication in respect of how many jurors made the troubling statements to Whittaker; and that the substance of the statements were not sufficient to overcome the presumption against interviewing jurors.

The law in this area is well settled. "Calling back jurors for interrogation after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing that a litigant may have been harmed by jury misconduct." *State v. Athorn,* 46 *N.J.* 247, 250, 216 *A*.2d 369 (1966). *See also R.* 1:16–1 (instructing that jurors may not be interviewed, examined, or questioned "[e]xcept by leave of court granted on good cause shown"). The requirement that a defendant make such a strong showing is intended to prevent juror harassment and avoid chilling jury deliberations. *State v. Harris,* 156 *N.J.* 122, 154, 716 *A*.2d 458 (1998), *cert. denied sub nom. Harris v. New Jersey,* 532 *U.S.* 1057, 121 *S.Ct.* 2204, 149 *L.Ed.*2d 1034 (2001); *Marshall III, supra,* 148 *N.J.* at 280, 690 *A*.2d 1.

Defendant first argues that Whittaker's statement relating to the length of the appellate process indicates that the jury may have believed incorrectly that it was not responsible for the verdict. We disagree. Nothing in the affidavit recounting Whittaker's statements indicates that the jurors considered the lengthy appeals process during deliberations. The same is true in respect of Whittaker's second statement regarding pending charges against defendant in New York. Although the jury knew from testimony that defendant had been arrested in New York, *DiFrisco II, supra,* 137 *N.J.* at 492–94, 645 *A*.2d 734, there is no evidence that the jury improperly considered other-crimes evidence during deliberations.

With regard to Whittaker's third statement, that defendant had previously visited the pizza parlor, defendant argues that the jury may have concluded that his actions were more premeditated than was supported by the evidence. Defendant's argument is misplaced. Defendant's diagram of the restaurant, which was intro-

duced at the retrial, depicts the parking lot behind the pizzeria, the stairs, the back and rear doors of the pizzeria, and the bus stop on the corner. In our view, the evidence presented supports a reasonable inference that defendant may have visited the pizzeria before the murder. Therefore, if the jury had drawn that inference it would not have been improper.

Defendant's final argument is that the jury erroneously believed that to return a life verdict, a unanimous decision was required. That argument, based on Whittaker's fourth statement, also is without merit. Whittaker did not say that the jury ultimately misunderstood the court's instructions on unanimity. Our conclusion is buttressed by the fact that the verdict sheet explicitly allowed for a non-unanimous verdict, and the trial court gave instructions on the issue of unanimity (which we reviewed in *DiFrisco II, supra,* 137 *N.J.* at 483–89, 645 *A.*2d 734).

Defendant seeks the exceptional remedy of interviewing jurors not because a deliberating juror presented an affidavit alleging misconduct, see *State v. Kociolek,* 20 *N.J.* 92, 95, 118 *A.*2d 812 (1955), but based on statements of an alternate juror as conveyed through PCR counsel's affidavit. In *State v. Koedatich,* we denied a similar motion because "the contents of a single newspaper article, indisputably hearsay, cannot be the sole basis for the extraordinary procedure of a post-trial jury interrogation." 112 *N.J.* 225, 289, 548 *A.*2d 939 (1988). Our conclusion is the same here. Defendant has not made the strong showing necessary to warrant the extraordinary procedure of post-trial interrogation of the retrial jurors.

### E.

### Ineffective Assistance of Experts

Defendant seeks reversal of his death sentence on the ground that he was deprived of his right under federal and State law to receive effective assistance of experts at the sentencing phase of his trial. We conclude that defendant's claim of ineffective

assistance of experts is not separately cognizable in the context of this petition. Stated differently, defendant's claim is subsumed under the auspices of an ineffective assistance of counsel claim.

In *Ake v. Oklahoma,* the Supreme Court declared that meaningful access to justice, under the Fourteenth Amendment to the federal Constitution, requires that the government provide an indigent defendant with "the basic tools of an adequate defense or appeal." 470 *U.S.* 68, 77, 105 *S.Ct.* 1087, 1093, 84 *L.Ed.*2d 53, 62 (1985) (internal quotation marks and citation omitted). The Court determined that when a defendant demonstrates that sanity will be a significant factor at trial, the government must assure that the defendant has access to "a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation" of the defendant's case. *Id.* at 83, 105 *S.Ct.* at 1096, 84 *L.Ed.*2d at 66. The Court was careful to note, however, that an indigent defendant did not have a right to choose a specific psychiatrist or to receive funds to hire his or her own expert. *Ibid.*

Numerous courts have cited *Ake* for the proposition that due process requires appointment of an expert when an indigent defendant establishes a substantial need for such an appointment, without which the fairness of his or her trial will be called into question. *See, e.g., Terry v. Rees,* 985 *F.*2d 283, 284–85 (6th Cir.1993) (involving pathologist on cause of death); *Little v. Armontrout,* 835 *F.*2d 1240, 1243–45 (8th Cir.1987) (involving expert on hypnosis); *State v. Coker,* 412 *N.W.*2d 589, 592–93 (Iowa 1987) (involving expert on intoxication defense); *Harrison v. State,* 635 *So.*2d 894, 900–02 (Miss.1994) (involving forensic pathologist).

Prior to *Ake,* New Jersey courts had found the assistance of experts to be guaranteed by the right to effective assistance of counsel under Article I, paragraph 10 of the New Jersey Constitution. *See State v. Green,* 55 *N.J.* 13, 18, 258 *A.*2d 889 (1969) (analyzing right to appointment of expert within framework of

right to counsel). Additionally, this Court determined that a specific provision of the Public Defender Act, *N.J.S.A.* 2A:158A–5, grants indigent defendants in New Jersey the statutory right to the assistance of experts necessary to their defense. *In re Cannady,* 126 *N.J.* 486, 492, 600 *A.*2d 459 (1991); *see also In re Kauffman,* 126 *N.J.* 499, 501, 600 *A.*2d 465 (1991) (finding that "the Public Defender Act mandates that the [Office of the Public Defender] pay for expert services that are necessary to any indigent defendant's case").

We find no reason to depart from our precedent in *Green* and similar cases that have analyzed the right to effective assistance of experts as part of a defendant's right to the effective assistance of counsel. We read *Ake* as merely confirming the guarantees regarding expert services already provided to defendants through our State Constitution and the Public Defender Act. To conclude otherwise would require New Jersey courts to sort out difficult distinctions between expert opinions. As federal courts have noted, a difference in opinion among experts is not unusual, *Harris v. Vasquez,* 949 *F.*2d 1497, 1522 (9th Cir.1991), *cert. denied,* 503 *U.S.* 910, 112 *S.Ct.* 1275, 117 *L.Ed.*2d 501 (1992), and to allow defendants to litigate such disagreements would place courts in "a never-ending battle of [experts] appointed ... for the sole purpose of discrediting a prior [expert's] diagnoses." *Silagy v. Peters,* 905 *F.*2d 986, 1013 (7th Cir.1990).

We are mindful that a psychiatric or other expert may provide substandard services. However, the deficient performance that implicates a defendant's right in that respect is the performance of counsel who obtained the expert's examinations or presented the evidence at trial. Consistent with *Ake* and its progeny, New Jersey courts should continue to evaluate the competence of experts within the framework of a defendant's claim of ineffective assistance of counsel. Accordingly, in view of our rejection of defendant's ineffective assistance of counsel claims, we also reject defendant's ineffective assistance of experts claim.

## F.

### Constitutionality of the Death Penalty Statute

Relying on our prior precedent, we cannot agree with defendant's remaining argument that the death penalty statute is unconstitutional under either the federal or State Constitution. *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987); *In re Proportionality Review Project (II)*, 165 *N.J.* 206, 757 *A.*2d 168 (2000).

## IV.

### Summary

We do not suggest that retrial counsel's performance was the model of representation in a capital case. To the contrary, the record indicates that counsel could have exercised greater care in managing the various experts and investigators in the case, and given better guidance to those experts charged with finding mitigation evidence. Moreover, counsel's experience level was not what we have come to expect in capital litigation. To prevail in this setting, however, defendant must do more than show that his retrial counsel lacked experience with New Jersey's capital sentencing system. He must demonstrate that such inexperience reflected an objectively unreasonable level of performance, and that it ultimately resulted in errors or omissions that substantially affected the jury's deliberations.

Defendant has not carried that considerable burden. Demonstrating his purported remorse was a difficult task for even an experienced capital litigator because of the nature of defendant's conduct. As for other possible mitigation, the fact that the jury unanimously found two factors related to defendant's relationship with Franciotti indicates that counsel performed adequately in focusing jurors on that aspect of the defense. Additionally, counsel's efforts to portray defendant in a more positive light were blunted by defendant's criminal past. Prosecutors could have presented damaging rebuttal evidence had counsel given them that opportunity by opening the door to that evidence.

The dissent asserts that we misconceive our appellate function. Not so. We do not conclude that a capital litigator acts reasonably by avoiding mitigating evidence that contains any negative component, however slight. Rather, our analysis merely recognizes the reality, seemingly ignored by the dissent, that the unfavorable aspects of the available mitigation evidence significantly diminished its usefulness to defendant. As made clear by our rationale in *Martini, supra,* 160 *N.J.* at 261–62, 734 *A.*2d 257, such considerations are entirely consistent with the Court's appellate function.

The jury considered, found, and weighed evidence of mitigation, and nonetheless determined that the aggravating factor outweighed the mitigating factors beyond a reasonable doubt. According counsel the heavy measure of deference to which they are entitled in these circumstances, we cannot trespass on the jury's finding. We are confident in our belief that even if retrial counsel had performed to the level advocated by PCR counsel, it would not have substantially affected the jury's penalty-phase deliberations. We thus reject all claims of ineffective assistance of counsel and of experts, and likewise find no reversible error on the part of the PCR court.

## V.

### Conclusion

The judgment of the Law Division denying defendant's petition is affirmed.

LONG, J., dissenting.

If we have learned anything from our review of capital cases, it is that juries often spare the lives of persons who have committed what society could legitimately characterize as the cruelest and most savage murders. That lenity is due, in great measure, if not completely, to the quality of the defense advanced on behalf of the accused.

> Those who have tried capital cases have found that the competent presentation of evidence often results in sentences less than death. But the right to have any of the diverse frailties of humankind taken into account is meaningless if the accused is not provided with counsel capable of finding and effectively presenting mitigating circumstances.
>
> [Stephen B. Bright, *Counselor for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer*, 103 YALE L.J. 1835, 1865 (1994) (footnotes omitted).]

It is in light of that reality that we should assess the majority's disturbing conclusion that the meager efforts of Anthony DiFrisco's defense team met constitutional standards. The shockingly poor defense afforded to DiFrisco, whose crime, although despicable, does not approach the savagery and cruelty we have seen in our capital case law, substantially affected the penalty phase deliberations.

The defense was plagued from its inception by the inexperience of defense counsel. It is true that inexperience does not, in and of itself, prove ineffectiveness. With industrious investigation, a coherent strategy, appropriate experts, and the advice of an experienced mentor, it is possible for a relatively unseasoned defense attorney to advance an effective case on behalf of a capital defendant.

That possibility did not come to fruition here. Not only was DiFrisco's defense team totally devoid of capital experience, but their presentation of his mitigation case was incoherent, ill-conceived, and scattershot, betraying the internal disagreements, disregard of mentors' advice, incompetent investigation, and lack of preparation that took place behind the scenes. As a result, DiFrisco was provided wholly inadequate representation at his resentencing trial, and has been condemned to the terrible penalty of death without having received minimally effective legal representation.

I

The majority opinion adequately recounts the facts surrounding DiFrisco's murder of Edward Potcher. As we have previously described the offense, DiFrisco

Fired four bullets at close range into the head of Edward Potcher, the owner of Jack's Pizzeria, at his Maplewood store on August 12, 1986. He fired a fifth bullet into the victim's body.... [A] man named Anthony Franciotti paid him $2500 to kill Mr. Potcher.

[*State v. DiFrisco*, 118 *N.J.* 253, 255–56, 571 A.2d 914 (1990) (*DiFrisco I*).]

However, in order to understand how poorly DiFrisco was represented throughout the proceedings that led to his death sentence, the circumstances surrounding that representation require fuller explication.

## A. Preliminary Matters

On February 22, 1991, during a post-appeal hearing on DiFrisco's motion for a directed verdict, the trial court was informed that in August 1990, the prosecutor invited DiFrisco to cooperate in the State's investigation of Franciotti. His lawyer, Samuel DeLuca, told the court that he did not answer the State's letter because the offer did not include a waiver of the death penalty. In fact, DeLuca did not respond to the overture until March 20, 1991, when he wrote to the prosecutor that he viewed the offer as a bad faith attempt to buttress the State's case. The prosecutor replied that DeLuca's response was a further indication that DiFrisco was not, and never had been, interested in cooperating. DeLuca countered that it was the State that had refused to accept DiFrisco's cooperation by imposing "conditions".

In September 1991, DiFrisco wrote to the court requesting the appointment of new counsel. He enclosed a letter he had sent to DeLuca, expressing his dissatisfaction with DeLuca's representation. DiFrisco complained generally about DeLuca's failure to consult with him and particularly about DeLuca's failure to pursue his desire to cooperate with the State. The court allowed DeLuca to withdraw from the case, and the Office of the Public Defender was ordered to provide counsel to DiFrisco.

On November 15, 1991, the court wrote to Patricia Kay, Deputy Public Defender in charge of the Essex County Regional Office,

reminding her that no public defender had been assigned to represent DiFrisco. Kay delegated the assignment responsibility to Joseph Krakora, chief of the homicide division. Krakora assigned Barbara Lapidus, who had no capital experience, as lead counsel, because all of the attorneys with relevant experience were busy with other capital matters. He selected Michelle Soto, who also had no capital experience and only two years of general criminal defense experience in all, to assist with the writing of briefs. Although Lapidus was reluctant to take on a capital case, she acquiesced when Krakora convinced her she could do the job and assured her that Soto would do the necessary legal writing.

Lapidus and Soto entered their appearances on November 21, 1991, at which time the court set a trial date of April 27, 1992. Lapidus told the court that she and Soto had full caseloads, including some "ready trials and some murders," and requested more time to prepare for DiFrisco's trial. The court responded that the date gave defense counsel "five, almost five-and-a-half months to get ready for this matter, and I think that's adequate time." The court later modified that schedule, ordering the defense to file expert reports by March 2, 1992 and the State by April 6, 1992, and requiring that all pretrial motions be filed by March 16, 1992. The court set a "firm trial date" of May 4, 1992.

## B. The Motion To Withdraw The Guilty Plea

On February 14, 1992, less than two months before trial, the defense moved to vacate DiFrisco's plea of guilty to capital murder. They retained Ronald Silikovitz, a psychologist, to evaluate DiFrisco for the plea withdrawal application. At a March 2, 1992 hearing, they requested an adjournment of the May 4 retrial date on the ground that they had not yet prepared a mitigation case. Soto told the court a continuance was necessary because the defense "need[ed] to have experts visit Mr. DiFrisco and complete reports as well as a complete investigation background of Mr. DiFrisco." When the court asked what defense counsel had been doing since they were assigned to the case four months earlier, Soto said their focus had been the withdrawal of the guilty plea and that the sole witness who had interviewed DiFrisco had done

so with only that purpose in mind. The court denied the adjournment and refused to hear the merits of the motion.

DiFrisco moved for leave to appeal. In its brief to the Appellate Division, the defense stated that an adjournment was necessary because defense counsel had "strenuously focused" on the motion to withdraw DiFrisco's guilty plea and was essentially unprepared for the penalty trial. The Appellate Division granted leave and reversed, remanding for a hearing on the motion and directing that the penalty retrial be held no earlier than September 8, 1992.

The trial court held an evidentiary hearing on DiFrisco's motion to withdraw his guilty plea on May 11, 1992. At the hearing, DiFrisco testified that DeLuca led him to believe that if he pleaded guilty and waived a jury for the sentencing phase, he would be sentenced to thirty years to life in prison. DiFrisco testified that had he known the death penalty was a realistic possibility he never would have entered a plea. DeLuca testified that he had advised DiFrisco that, in his opinion, it was extremely unlikely the court would impose a death sentence in his case. DeLuca also explained that he never developed mitigation evidence on behalf of DiFrisco because he believed the court would impose a life sentence. Defense counsel argued that DiFrisco should be allowed to withdraw his plea because it was involuntary in view of DeLuca's erroneous assurances that he would receive a life sentence. However, the defense made clear that its argument was not premised on ineffective assistance of counsel.

On May 12, 1991, the trial court denied the motion, finding that DiFrisco knew the death penalty was a possible outcome when he agreed to plead. In so ruling, the court underscored the inconsistency between DiFrisco's argument that he was misinformed of the consequences of his plea and his failure to raise the issue of ineffective assistance of counsel.

Retrial of the penalty phase was scheduled for September 14, 1992. The court ordered that all mitigating factors be filed within ten days and that expert reports be provided to the prosecutor's

office within 30 days. The Appellate Division affirmed the court's decision.

Counsel then moved before this Court for the opportunity to reopen the motion to withdraw the guilty plea on the ground that DiFrisco had been denied the effective assistance of counsel. This Court ordered the trial court to conduct an expedited hearing on DiFrisco's ineffective assistance of counsel claim.

At the hearing, which took place over four days in August 1992, DeLuca testified, as he had previously, that he had advised DiFrisco to plead guilty and to waive a penalty-phase jury because he was certain the trial court would not impose a death sentence. DeLuca said that because of DiFrisco's confession, he believed the guilt case to be insurmountable. He could not remember how many times he consulted with DiFrisco before the guilty plea, but acknowledged that he had not done any investigation, gathered any mitigating evidence, or consulted any experts. DiFrisco testified that, in entering his plea, he relied entirely upon DeLuca's assurances that he would not receive a death sentence. The trial court again denied DiFrisco's motion to withdraw the guilty plea, finding that DeLuca did not make improper promises regarding DiFrisco's sentence and that DeLuca's decision not to investigate was reasonable. The defense moved for leave to appeal, which this Court denied on October 20, 1992. On November 20, 1992, the trial court informed counsel that jury selection would begin on January 11, 1993, and that a list of all possible witnesses should be produced by December 7, 1992.

### C. Trial Preparation & Mitigation Investigation

Defense counsel was not ready for the retrial. As will be detailed below, the mitigation investigation was incomplete; changes in counsel hampered the defense team's preparation; and the experts—to the extent that there were any—were inadequate to the task and unprepared.

### 1. Ronald Silikovitz

As noted, from February through August 1992, Lapidus and Soto had focused their efforts on the motion to withdraw the guilty

plea. To that end, they retained Silikovitz to evaluate DiFrisco. Krakora approved Silikovitz's retention as an expert "to evaluate client for purposes of motion to retract guilty plea in capital case." How Silikovitz came to counsel's attention is unclear. Evidently, he had previously worked on cases for the Public Defender's Office and had provided that office with brochures reflecting his education and experience. When contacted by Soto in February 1992, he was led to believe that a decision had already been made to retain him, but Soto did not discuss his experience in testifying or his areas of expertise. In fact, Silikovitz had *no* relevant experience. He specialized in evaluating "special needs children, sexual abuse . . . the kind [of cases] that [the New Jersey Division of Youth and Family Services] would investigate which include also bonding [and] termination of parental rights." He had never worked on a capital case.

On February 14, 1992, Soto sent Silikovitz a case syllabus, a detective bureau case report, a transcript of DiFrisco's guilty plea, and a transcript of the first penalty trial for his use in evaluating DiFrisco. Silikovitz then spent three hours with DiFrisco on February 21, 1992.

Although Silikovitz had been retained to evaluate DiFrisco for the motion to retract his guilty plea, he was never told the legal standards for plea withdrawal, and he never discussed those standards with trial counsel. Moreover, although trial counsel claimed to have intended that DiFrisco be evaluated for the presence of learning disabilities, they never asked Silikovitz to do so, and he did not. Indeed, he was not even provided with DiFrisco's school records. Neither was Silikovitz asked to evaluate DiFrisco for any other disorders, and he did not.

Because trial counsel had emphasized the urgency of receiving the report before the March 2, 1992 deadline, Silikovitz produced his first report on February 25, 1992, four days after meeting with DiFrisco. Notwithstanding trial counsel's stated purpose in re-

taining Silikovitz, the report did not address the voluntariness of DiFrisco's guilty plea. Instead, it recited DiFrisco's version of the circumstances of his confession and discussed his overall psychological state. Silikovitz reported that DiFrisco could not "recall any phase of the confession process," because "he was high on cocaine and probably also heroin at the time when the 'confession' was made," that DiFrisco's mother and personnel at the Parole Department had witnessed his condition that day, and that his attorney and the physician who treated him for his drug withdrawal following his arrest "witnessed and most likely documented the state that he was in while he was being questioned."

Silikovitz found that DiFrisco manifested "guilt and remorse related to his history of criminal and drug activity," and that "he understands fully that specific crimes deserve specific consequences." Analyzing the results of the intelligence tests he had performed, Silikovitz reported that DiFrisco "had his greatest difficulty on tasks requiring him to arrange pictures depicting social situations in a logical sequence," and that "Mr. DiFrisco may be more of a follower and a victim of circumstances rather than an individual who tends to initiate, originate, and create difficulty." Silikovitz found that DiFrisco's figure drawings similarly suggested his "tentativeness, self-doubt, and uncertainty regarding identity and, precisely, who he is." Silikovitz further noted that DiFrisco "appears to be interested in rehabilitation," and that he was "optimistic and goal-directed." He said that DiFrisco was "fully cooperative with [him]," and that he "had the sense that Mr. DiFrisco was being totally candid, open and honest regarding the issues that were being discussed. This tendency further reflected his apparent credibility." Despite his observation that DiFrisco "does have a good sense of what is right and what is wrong," however, Silikovitz's ultimate diagnosis was Antisocial Personality Disorder (ASPD)[1] and multiple drug dependencies.

---

[1] The American Psychiatric Association defines Antisocial Personality Disorder as follows:

Soto testified at the PCR hearing that, upon reviewing that report, she concluded that it was harmful to DiFrisco. In particular, she was concerned that the ASPD diagnosis "may have caused the defense not to use Silikovitz as a witness." Lapidus was less concerned about the diagnosis, and thought that, when viewed in the context of the rest of the report, it was not terribly damaging. Krakora, the only experienced capital litigator to review the report, concluded that it was "awful," and considered it to herald "the end of Silikovitz." In Krakora's view, which he expressed to Soto and Lapidus, the report indicated that Silikovitz did not have a grasp of "the big picture," and did not seem to understand that "this was a forensic evaluation in a capital murder case for someone who pled guilty to a capital murder."

Despite the misgivings of Soto and Krakora, Lapidus not only maintained contact with Silikovitz but also expanded his role.

---

The essential feature of this disorder is a pattern of irresponsible and antisocial behavior beginning in childhood or early adolescence and continuing into adulthood. For this diagnosis to be given, the person must be at least 18 years of age and have a history of Conduct Disorder before age of 15.

Lying, stealing, truancy, vandalism, initiating fights, running away from home, and physical cruelty are typical childhood signs. In adulthood the antisocial pattern continues, and may include failure to honor financial obligations, to function as a responsible parent or to plan ahead, and an inability to sustain consistent work behavior. These people fail to conform to social norms and repeatedly perform antisocial acts that are grounds for arrest, such as destroying property, harassing others, stealing, and having an illegal occupation.

People with Antisocial Personality Disorder tend to be irritable and aggressive and to get repeatedly into physical fights and assaults, including spouse- or child-beating. Reckless behavior without regard to personal safety is common, as indicated by frequently driving while intoxicated or getting speeding tickets. Typically, these people are promiscuous (defined as never having sustained a monogamous relationship for more than a year). Finally, they generally have no remorse and the effects of their behavior on others; they may even feel justified in having hurt or mistreated others. After age 30, the more flagrantly antisocial behavior may diminish, particularly sexual promiscuity, fighting, and criminality.

[American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 342 (3d ed. Revised 1987) (DSM–III–R).]

Specifically, on March 7, 1992, she asked Silikovitz to evaluate and assess possible mitigating factors, sending him background materials for that purpose. Silikovitz's notes from the March 7, 1992 conversation indicate that he understood he was to try to "save DiFrisco's life." Lapidus asked Silikovitz to meet with DiFrisco a second time, and to add to his report a discussion of mitigating factors in preparation for the May trial. That was the first time that anyone had discussed mitigating factors with Silikovitz. On March 11, 1992, Silikovitz met with DiFrisco for three more hours. That was his last meeting with DiFrisco, thus bringing the total time Silikovitz spent with DiFrisco to six hours.

*After* the interview, on March 17, 1992, Pamela Cuevas, an investigator with the Office of the Public Defender, faxed to Silikovitz a witness list and a copy of the section of the New Jersey criminal code listing aggravating and mitigating factors in death penalty cases, pursuant to Lapidus's direction. Prior to receiving that information, and given his complete lack of experience in capital cases, Silikovitz did not know what legally constituted aggravating and mitigating factors. Because he was unaware of the relevant legal standards when he conducted his second interview of DiFrisco, Silikovitz simply relied on DiFrisco's own reasons for why he should not be put to death.

After conducting telephone interviews with four of DiFrisco's family members and his former girlfriend, Silikovitz met with Lapidus on May 18, 1992, to discuss possible mitigating factors, and with Lapidus and Soto on June 1, 1992, to discuss the pertinent diagnostic criteria listed in the DSM–III–R. Lapidus and Soto requested that Silikovitz revisit his ASPD diagnosis. Upon reviewing the DSM–III–R with trial counsel, Silikovitz concluded that his earlier diagnosis, which had been based upon his faulty recollection of the DSM–III–R criteria, had been incorrect.

On June 8, 1992, Silikovitz again met with Lapidus and Soto to discuss additional, mainly stylistic, revisions to his report. Trial counsel never asked Silikovitz to conduct further psychological or

neurological tests on DiFrisco or otherwise to develop additional potential mitigating evidence. Soto testified that Silikovitz communicated to her that his evaluation of DiFrisco was "comprehensive" and that she therefore believed that further testing was not necessary. She stated, "I certainly relied on [Silikovitz] as the expert in this case to guide me with regard to any further testing *he* felt the results of the test that he had done would warrant." (Emphasis added). Thus, because Silikovitz told her that the testing was adequate, Soto did not request additional testing. Indeed, Soto relied entirely on Silikovitz's assessment of what tests were appropriate because, as she acknowledged, she never familiarized herself with the different types of psychological testing that were available and generally used in similar cases. She therefore was unable to review Silikovitz's initial report with even a modicum of sophistication and was unable to form an opinion regarding the completeness of the testing to determine whether additional tests were necessary.

By Silikovitz's own admission, however, his testing was not comprehensive. For example, he had not administered any objective psychological tests (as contrasted with projective or intelligence tests), which constitute an essential element of a comprehensive forensic psychological evaluation. Moreover, the psychological tests that Silikovitz did perform were administered in an incomplete manner. He testified that, due to time constraints, he did not perform the standard sub-parts of the intelligence test he administered. PCR counsel's expert, Dr. Alan Goldstein, explained that only three of the nine tests Silikovitz administered were complete. Nevertheless, Silikovitz produced a revised report. It deleted the former ASPD diagnosis and replaced it with a diagnosis of "Adult Antisocial Behavior." [2]

---

[2] The American Psychiatric Association explains Adult Antisocial Behavior as follows:

> This category can be used when the focus of attention or treatment is adult antisocial behavior that is apparently not due to a mental disorder, such as Conduct Disorder, Antisocial Personality Disorder, or an Impulse Control

Although it was dated June 4, the report was not completed until August 22, 1992, and incorporated additional changes suggested at the June 12 meeting between Silikovitz, Lapidus, and Soto.

The second report, unlike the first, included a section explicitly discussing mitigating factors and summarizing interviews with DiFrisco's family members and his former girlfriend.[3] It also provided greater detail to support Silikovitz's conclusion that DiFrisco was remorseful:

> Mr. DiFrisco spoke of the grief and remorse that he has suffered as a result of the crime. He notes that "this crime has pressed so deep—it wasn't really me—I was like a machine—I was a different person" while under the influence of drugs. He spoke about remorse and depression. He stated, with considerable affect and credibility, "if I could cut my arm off to change it,—I would. I feel bad and I feel worse than this person's family. I feel remorse. I try to blot it out. It is hard to .identify with the other me." He further indicated that he has had "bouts of depression" during the course of his incarceration.
>
> . . .
>
> In this psychologist's expert opinion, these feelings of guilt, remorse, and depression are genuine. They reflect the thought that Mr. DiFrisco has given over the past five years to the implication of his act to the decedent's family and to society. The crime was, in this psychologist's view, a somewhat traumatic event for Mr. DiFrisco.

Silikovitz's second report summarized information about DiFrisco's childhood, in particular his lack of supervision and need for male role models, that had not been included in his first report. It also tethered those aspects of DiFrisco's childhood to his history of substance abuse:

> Mr. DiFrisco's father was not an adequate role model and Anthony was never emotionally close with his father. Consequently, he desperately sought the approval of his siblings, his peers and ultimately Mr. Franciotti, who was clearly a father figure. Mr. DiFrisco began to become involved with drugs, first on a casual basis

---

> Disorder. Examples include the behavior of some professional thieves, racketeers, or dealers in illegal psychoactive substances.
> [DSM–III–R, 359.]

[3] As indicated above, Silikovitz relied upon the information that DiFrisco thought would be mitigating, because Silikovitz was unaware of the statutory mitigating factors at the time of his second meeting with DiFrisco.

and then on a heavy, addicted basis. He is a drug addict and has been dependent on both cocaine and heroin. Predisposed to substance abuse and criminal activity, increasingly susceptible to the influence of his peers, and desperately seeking approval, Mr. DiFrisco was particularly vulnerable at the time that Mr. Franciotti made the offer that he did.

Silikovitz reiterated his conclusions about DiFrisco's remorse and his susceptibility to influence by others. Finally, the second report—consistent with the first—opined that DiFrisco was candid and sensitive, and that he had rehabilitative potential.

Lapidus and Soto responded differently to Silikovitz's second report. Lapidus found the report useful, in part because it conveyed DiFrisco's remorse, which she considered to be the "key" to the mitigation case. She stated that "when I first met Anthony, and had the opportunity to speak with him and interview him, it was apparent to me that he was clearly remorseful." Lapidus further believed that the report conveyed DiFrisco's regard for Franciotti as a father figure and his susceptibility to Franciotti's influence because of his drug dependency and need for a male role model. Finally, she approved of Silikovitz's recitation of DiFrisco's extensive drug use and linkage of the drug abuse to his crime. Soto, on the other hand, remained troubled by Silikovitz's original diagnosis of ASPD and the revised "adult antisocial behavior" diagnosis. She was "adamant" that Silikovitz not be called as a witness.

Silikovitz believed he would testify as an expert witness at the trial. However, with the exception of one administrative phone call from investigator Pam Cuevas in October 1992, Silikovitz never heard from the defense team again. He learned that he had not been called to testify at trial only after the fact, when a member of his synagogue told him DiFrisco had been sentenced to death. As it turns out, Silikovitz was dropped from the defense team and was not replaced by another, more competent witness, because of a shift in DiFrisco's counsel.

### 2. William Annitto

The second mitigation expert hired by defense counsel was Dr. William Annitto, a psychiatrist with expertise in the field of

substance abuse. Although the form approving his retention indicated that Annitto would be consulted to develop mitigation evidence about DiFrisco's drug addiction and its impact on his life, Annitto apparently believed that his testimony was to be used for plea withdrawal purposes. He submitted a brief report addressing only DiFrisco's drug use at the time of his confession. Annitto concluded that DiFrisco's use of cocaine, valium, and heroin, as he reported it, would have had a dramatic impact on his physical condition at the time of his arrest and confession. The report stated that DiFrisco would have been suffering severe withdrawal by the time of his confession, which would have led him to "say just about anything so as to get some relief and peace." Annitto did not address other issues relevant to mitigation in his report, for which the Office of the Public Defender had approved his retention, and, for unknown reasons, his conclusions were not relied on in defense counsel's motions to withdraw DiFrisco's guilty plea.

### 3. Alfonso Associates

Defense counsel also retained Alfonso Associates, a consulting firm that specializes in, among other things, the collection and presentation of psychosocial mitigation evidence. Cessie Alfonso, the director of the firm, was highly regarded inside and outside the Office of the Public Defender. After retaining Alfonso Associates, Lapidus and Soto deferred entirely to Alfonso Associates in respect of the mitigation investigation. They provided no guidance to Ms. Alfonso regarding the focus of the mitigation investigation and did not inform Ms. Alfonso of any overarching theory or strategy for the mitigation case. Lapidus explained that she did not supervise Alfonso Associates, "mainly because [she] was comfortable with the fact that [Ms. Alfonso] knew what she was doing." Although Soto acknowledged that the defense team had a responsibility to supervise Ms. Alfonso's work, she also viewed Alfonso Associates as "the experts" and relied on them to guide the mitigation investigation. In fact, for several months, Pam Cuevas, who had no prior experience or training for capital cases,

was the only member of the Office of the Public Defender to communicate with Alfonso Associates.

Lapidus and Soto did not provide Silikovitz's reports to Alfonso Associates, and Ms. Alfonso and her staff never saw the reports. Likewise, the work of Alfonso Associates never was shared with Silikovitz. Although Lapidus explained that the reports never were exchanged because Silikovitz and Alfonso Associates were preparing them "contemporaneously," that is not accurate. Silikovitz's first report was submitted in February 1992; Alfonso Associates' initial report was submitted in June 1992; and Silikovitz's second report was completed in August 1992.

Ms. Alfonso and her associate, Jeffrey Hitchcock, testified that if had they seen Silikovitz's report while they were conducting their investigation, they would have done significantly more research into a number of issues raised in his report, including DiFrisco's relationship with Franciotti, the connection between that relationship and DiFrisco's need for a father figure, the traumas and losses that took place during DiFrisco's youth, and his depression and remorse. Likewise, Silikovitz testified that had he seen DiFrisco's school records, which had been obtained by Cuevas, and which indicated a learning disability, he would have conducted further psychological testing to probe DiFrisco's cognitive functioning.

On June 5, 1992, Alfonso Associates sent defense counsel a preliminary report prepared by Ms. Alfonso, Hitchcock, and another associate, Carmeta Albarus. The cover letter to the report indicated that it was submitted for defense counsel's review. Ms. Alfonso did not consider the report final, as interviews of teachers, family members, and others remained to be done, and records needed to be examined. Nonetheless, according to Ms. Alfonso and Albarus, despite repeated calls, Alfonso Associates received no word from defense counsel for five months. Accordingly, Ms. Alfonso "discontinued" the investigation, believing the case was dormant or resolved.

#### 4. First Change in Counsel

In October 1992, Lapidus went to Krakora and complained of difficulty working with Soto. In response, Krakora removed Soto from the case and assigned Peter Liguori as assistant counsel. Liguori was scheduled to be married and go on a honeymoon the month before the penalty retrial. Nevertheless, Krakora picked him to replace Soto, because he "thought he was a good worker who would do a good job." Liguori had been working at the Office of the Public Defender just over two years at the time of his assignment and, like Lapidus and Soto, had no experience working on capital cases. In his first weeks assigned to the case, Liguori familiarized himself with the file. He did not initiate new mitigation investigations or consider retaining new experts, because he was under the impression that all of the preparation had been done and he would simply be preparing for trial.

Soon after Liguori was assigned to the case, however, the trial preparation changed dramatically. In November 1992, Ms. Alfonso notified defense counsel that, due to health problems, she would be unable to testify at trial. She recommended Billy Feinberg, a social worker with experience testifying in capital cases, to replace her. She did not recommend to defense counsel that they rely on any of her own employees to testify as mitigation experts. At counsel's request, and in anticipation of an adjournment motion, Ms. Alfonso provided a letter explaining the circumstances that prevented her from testifying. However, defense counsel did not file an application for an adjournment because they assumed it would be denied and feared it would anger the court.

#### 5. Second Change in Counsel

The decision regarding Ms. Alfonso's replacement was not made by Lapidus and Liguori because, at the same time that Ms. Alfonso withdrew from the case, there was yet another change in the defense team. On November 23, 1992, just six weeks before trial, and during the time that Liguori was out of the country on his honeymoon, Lapidus resigned from the Office of the Public Defender. Krakora re-assigned Soto as lead counsel. At the

PCR hearing, Krakora testified that he never would have assigned two such relatively inexperienced attorneys as Soto and Liguori to a capital case at the outset. Nonetheless, one month before trial, Soto, who had only two years' experience trying criminal cases, and had no training in the investigation and presentation of a case in mitigation of the death penalty, became lead counsel for DiFrisco's sentencing trial. Liguori, who had the same amount of experience and training as Soto, was assistant counsel. Furthermore, Soto retained her full caseload for several weeks leading up to the trial.

### 6. Carmeta Albarus

Thus, it was Soto and Liguori who made the decision regarding Ms. Alfonso's replacement. Instead of requesting an adjournment, they decided that one of Ms. Alfonso's assistants, Carmeta Albarus, would replace Ms. Alfonso as the mitigation expert. Alfonso opposed the decision, telling counsel that Albarus was not an appropriate choice because of her lack of educational credentials and her lack of experience in testifying. Liguori explained that although Ms. Alfonso recommended social worker Billy Feinberg, she was not chosen because she did not know the case. Although Albarus lacked a degree in social work, she was "familiar with the file."

Prior to her assignment to testify as an expert witness, Albarus was a case manager at Alfonso Associates, which meant that her involvement with the case had been limited to filing and making sure "the client was being seen and certain things were being done." Soto characterized the decision to use Albarus as "tactical." According to her, Albarus was preferable to Feinberg because Albarus was familiar with DiFrisco's file, had worked on many capital cases, and was "relied on heavily" by Ms. Alfonso. Soto stated that she consulted with her supervisors, Krakora and Kapin, and other attorneys at the Public Defender's Office, and that they agreed with her that "Albarus would be the more appropriate witness to put forth that psycho-social evidence." However, Krakora did not recall those conversations, and Kapin

denied that he ever discussed that decision with Soto. Indeed, Kapin testified that he never even knew "that there was a replacement witness problem."

At any rate, in December 1992, the attention of defense counsel turned to transforming Albarus into an expert witness. Those preparations included having Albarus re-interview several of the witnesses previously interviewed by other Alfonso employees so that she would have personal knowledge of the individuals and the information; "developing" Albarus' resume, because she had not previously testified and did not have a prepared resume; and submitting a second report, dated January 22, 1993, that reiterated the preliminary conclusions and incorporated information adduced from the additional interviews. The new information covered in the second report was described in the unsigned cover letter that accompanied the report:

> Follow-up interviews conducted with Mr. Anthony DiFrisco, his father, Alfred DiFrisco; his mother, Anna DiFrisco, and his step-mother, Janet DiFrisco; and his siblings, Fred and Fran DiFrisco[.] [W]e have also conducted interviews with his aunt and uncle, Mary and Joseph Grillo. A copy of the decree of divorce granted to Alfred DiFrisco, dated 11/29/72 was also reviewed.

The letter stated that the substance of the report bore "no significant changes and the themes and issues remain consistent" with the June 9, 1992 report. The bulk of the additional investigation that Ms. Alfonso originally had identified as necessary to complete the mitigation investigation interviews of teachers, family members, and former girlfriends, review of parole records, and investigation of DiFrisco's drug addiction prior to the offense—never was done.

### 7. Peter Schiffman

Just three weeks before the penalty retrial, Soto retained Dr. Peter Schiffman to testify as an expert witness on drug abuse and its effects on judgment. That decision marked a departure from defense counsel's earlier strategy, which had been to keep from the jury evidence of DiFrisco's drug use. As Liguori explained, counsel wanted to avoid the impression that DiFrisco was a "drug-

crazed fiend." Soto explained that the decision to use Schiffman was tactical, because drug addiction was "a very viable explanation for committing this offense," although she agreed it was not a replacement for other mitigating evidence, such as remorse, which she said she planned to present through a witness other than Schiffman. Soto stated that she made the decision to call Schiffman after consulting with her supervisors, Krakora and Kapin. Once again, Krakora had no recollection of speaking to Soto about the matter or advising her to use Schiffman. Kapin testified that he did *not* discuss Schiffman with Soto and that, if he had discussed the issue, he would have strongly advised Soto not to retain Schiffman because of a prior bad experience he had with him. Liguori testified that he actually recalled Kapin advising Soto against using Schiffman.

According to Soto, the plan was to limit Schiffman's testimony to the effects of drug abuse in general. He would not address whether DiFrisco had used drugs at or near the time of the offense. Soto limited the scope of his testimony because discovery deadlines had long since passed, and she was concerned the trial court would not otherwise permit Schiffman to testify. Furthermore, the investigation, such as it was, had failed to uncover sufficient documentary corroboration supporting DiFrisco's claim that he had been using drugs at the time of the offense.

On December 16, 1992, defense counsel made a proffer to the trial court regarding Schiffman's testimony. Soto told the court that Schiffman would testify about "the pharmacology, the variations in usage which would include free-basing, IV use, [and] snorting" and the "general effects of cocaine and heroin on the individual." Soto further represented to the court that, although Schiffman had conducted interviews with DiFrisco and his siblings and had come to the conclusion that DiFrisco had a long history of drug abuse that had continued up to the time of his incarceration for the killing of Potcher, Schiffman would not offer "an opinion with respect to the defendant's specific state of mind at the moment when the crime was done or when he was hired to do the

crime," nor would he testify "that the defendant did not know the nature of his acts or what [he was] doing." Based upon those limitations, which essentially rendered Schiffman's testimony useless, the court allowed the witness to testify.

### D. The Penalty Retrial

Jury selection took place from January 11 through January 25, 1993. On February 1, 1993, the penalty trial commenced. On the morning that opening statements were to be given, Soto and Liguori met with assistant Prosecutor Norman Menz to discuss once more DiFrisco's cooperation with the State's investigation of Franciotti. Because the prosecutor's office still would not offer a life sentence in return for DiFrisco's cooperation, Soto, like DeLuca before her, cut off communication, persisting in the view that it was not in DiFrisco's interest to cooperate.

In its opening argument, the State described DiFrisco's confession to the Potcher killing and portrayed DiFrisco's offense as a premeditated murder for hire. The prosecutor underscored DiFrisco's failure to cooperate, and concluded with the statement: "[I]f ever there were a case where someone should get the death penalty, this is the case, and the time is now."

Liguori focused on the confession in his opening statement and argued that it was a sign of remorse. He told the jury that DiFrisco's confession, for which he received nothing in return, could be explained only by his internal suffering for the crime he had committed. Liguori also emphasized the extent to which DiFrisco had, in fact, cooperated with the police regarding Franciotti. He described DiFrisco's family life generally, including the absence of male role models, and pointed out that Franciotti stepped into that void, providing DiFrisco with drugs and acting as a father figure. Liguori suggested that Franciotti manipulated DiFrisco into committing the offense and had "manipulated this case ... this whole process." DiFrisco was not, Liguori concluded, a "kill again and kill again hit man," but a one-time, "drug dependent" killer whose crime was directed by an "older, controlling man."

The State's evidence, presented over the course of two days, was largely the same as it had been at the first penalty trial, recounting the investigation, the crime scene, and DiFrisco's confession. DiFrisco's testimony from the first penalty trial was read to the jury, and a dental expert testified that the tooth marks left on a slice of pizza recovered from the crime scene were made by DiFrisco. The defense case lasted one day. It consisted of the testimony of Albarus, Schiffman, and DiFrisco's sister, father, brother, and mother.

### 1. Carmeta Albarus' Testimony

Albarus testified as a mitigation specialist.[4] She acknowledged that a full psycho-social history had not been completed but narrated the basic story recounted by the DiFrisco family including Fred DiFrisco Sr.'s life-long emotional unavailability to DiFrisco; his mother's depression; the history of drug abuse among all of the DiFrisco boys, including the 1987 death of the eldest son, Richard, by overdose. Finally, she briefly discussed DiFrisco's relationship with Franciotti, stating that Franciotti supplied DiFrisco with drugs.

Albarus was discredited as a witness when the prosecutor elicited that she did not have an undergraduate degree in psychology, let alone an advanced degree of any kind, and that she lacked training in substance abuse. She was further impeached based on the contrast between her lack of qualifications and the credentials of Ms. Alfonso. Finally, when the prosecutor elicited that the expert report submitted by Albarus was virtually identical to the prior report submitted by Ms. Alfonso, it left the jury with the negative—but accurate—impression that Albarus had adopted the findings of her supervisor, simply reproducing and signing Alfonso's report and presenting it as her own.

---

[4] It is interesting to note that during pretrial motions, the prosecutor vigorously argued that Albarus was not a mitigation expert and, indeed, not an expert in anything.

## 2. Peter Schiffman's Testimony

Schiffman's testimony at the penalty retrial was, according to Soto, "devastating to Anthony DiFrisco's defense." Schiffman deviated greatly from what Soto anticipated he would say. He testified that DiFrisco had been using drugs, including cocaine and heroin, since he was 14 or 15 years old and then told the jury that heavy use of cocaine usually leads to paranoia, followed by "out and out psychosis." Schiffman explained the addictive qualities of cocaine by relaying an experiment in which rats chose cocaine over food until they starved to death, and said that humans addicted to cocaine would "do anything to feel better" when they are going through withdrawal. Schiffman said the lives of cocaine addicts revolve around getting the drug, even to the point of "hurting people" to get it. He then told the jury that heroin, by contrast, is "a far less dangerous drug to the community than cocaine, because people only do bad things on it when they're trying to get it." According to defense counsel, Schiffman's testimony left the jury with the impression that DiFrisco, as a user of both cocaine and heroin, was a danger to the community.

At the conclusion of the evidence, DiFrisco made a brief statement to the jury, asking the jurors to spare his life:

> Ladies and gentlemen of the jury, I am deeply, deeply sorry for taking the life of Mr. Potcher. I'm equally sorry for his family as well as mine. I ask you and I plead with you to spare my life, not give me the death penalty. Thank you. Thank you all.

Also at the conclusion of the evidence, but out of the jury's presence, the court told counsel that it was considering striking remorse as a mitigating factor because defense counsel had presented *no* evidence of it. The only suggestion of remorse, the court observed, was in DiFrisco's allocution, which was not evidence. Defense counsel objected, informing the court that remorse was one of the "central themes" of their mitigation case. Implicitly acknowledging that they had presented no evidence of remorse, however, defense counsel argued that the present remorse mitigating factor should not be struck, because present remorse could be inferred from "past expressions of remorse."

The court allowed the remorse mitigating factor to remain, ruling that "although it may be a stretch, the jury may infer the continuing presence of remorse from the [confession] and prior testimony, if they so wish."

### 3. Closing Arguments

In summation, Soto argued to the jury that DiFrisco's confession to an otherwise unsolved murder should weigh heavily against the imposition of a death sentence. She further argued that DiFrisco's cooperation with the police in their investigation of Franciotti should be considered in his favor, and that his remorse—conveyed through both his statements to the police that he wanted to clean the slate and his inability to sleep after the murder—should weigh against a finding that he was a cold-blooded killer for hire. Soto briefly discussed Franciotti's influence on DiFrisco, stating that Franciotti had used him, manipulating him by providing him with "the one thing that he couldn't control," drugs, and the other thing that he craved, parental approval.

The State's closing argument reviewed all of the evidence in the case that supported the aggravating factors and specifically contended that there was no evidence of DiFrisco's remorse. The prosecutor painted a portrait of DiFrisco as a cold-blooded hitman for hire.

The jury returned a verdict the next day. In terms of aggravating factors, the jury found unanimously that the murder was for pecuniary gain but rejected the existence of the second aggravating factor, that the murder was committed for the purpose of escaping detection for another crime.

It unanimously rejected four mitigating factors—that DiFrisco was under the influence of extreme mental or emotional disturbance and was unable to appreciate the wrongfulness of his actions on account of intoxication; that he was dependent on Franciotti for drugs; that his motive in confessing to the murder was remorse; and "any other factor."

Of the remaining factors, the jury unanimously found that nine had been established: (1) DiFrisco's childhood and upbringing; (2) his suffering due to his father's lack of love and attention; (3) his mother's inability to provide discipline and guidance; (4) the unavailability of his older brothers for support due to their drug abuse; (5) his failure to develop any self-esteem; (6) his stunted maturity level due to drugs; (7) his vulnerability to Franciotti as a father figure; (8) his manipulation by Franciotti; and (9) that Potcher's killing would have remained unsolved but for his confession.

The jury split 6–6 on whether DiFrisco had rendered substantial assistance to the State in the prosecution of another for murder. Regarding whether his excessive drug use affected his ability to make sound judgments, eight voted no and four yes. Finally, on whether DiFrisco remained remorseful about the killing, eleven voted no and one yes. The jury unanimously concluded that the sole aggravating factor that had been established outweighed the mitigating factors, and DiFrisco accordingly was sentenced to death.

### E. DiFrisco's Petition for Post–Conviction Relief

DiFrisco's PCR counsel carried out the kind of thorough, competent mitigation investigation that should have been conducted prior to the penalty-phase retrial. The experts they hired, whose testimony will be detailed below, rendered corporeal the evanescent mitigation case adduced by defense counsel. In brief, PCR counsel presented the expert report of Alan Goldstein, Ph.D., a forensic psychologist, who conducted twenty-six hours of interviews with DiFrisco, interviewed DiFrisco's family and friends, and administered a comprehensive battery of psychological tests. Goldstein concluded that DiFrisco was remorseful after his crime and continues to be remorseful today. Goldstein found that DiFrisco does not suffer from ASPD but from a learning disability, Attention Deficit/Hyperactivity Disorder (ADHD), which, combined with years of substance abuse, explained his poor judgment and excessive reliance on others to guide his social behavior.

Goldstein's report also laid out the ways in which Silikovitz's evaluation of DiFrisco was incomplete and grossly inadequate, deviating dramatically from the standard of care of a competent psychologist.

In addition, PCR counsel presented the expert report of Wilfred Van Gorp, Ph.D., a neuropsychologist. Van Gorp attested to Goldstein's conclusion that DiFrisco suffered from ADHD since childhood, which resulted in diminished cognitive abilities, exacerbated by years of substance abuse. Van Gorp opined that those impairments made it difficult for DiFrisco to make sense of social situations and resulted in his susceptibility to the influence of others, such as Franciotti, who Van Gorp characterized as a mentor figure.

The report of Robert L. Smith, Ph.D., a psychologist with an expertise in the diagnosis and treatment of substance abuse, also was proffered. Smith evaluated the effects of DiFrisco's drug use on his cognitive functioning and concluded that, at the time of the offense, DiFrisco's ability to appreciate the wrongfulness of his actions was diminished.

PCR counsel offered the expert report of Jill Miller, MSW, a mitigation specialist who completed a comprehensive psycho-social history of DiFrisco. Miller found DiFrisco to be remorseful, a conclusion reinforced by her interviews with a nun who advised him in prison. By interviewing a number of individuals who knew DiFrisco throughout his life, Miller also discovered numerous incidents of kindness and generosity that indicated he was a person capable of rehabilitation. Miller also evaluated the mitigation investigation performed by trial counsel and concluded that it was deficient in many respects, falling well below established standards of practice for the development and presentation of mitigation evidence for penalty phases of capital trials.

Finally, the expert report of David I. Bruck, Esq., an attorney with significant experience in capital cases was offered. Analyzing the record in this case, Bruck detailed the ways in which trial

counsel's performance fell far below national standards for capital defense counsel.

The court declined to allow the psychological experts to testify, although it received their reports in evidence; excluded Bruck's report altogether; and denied DiFrisco's motion. In so doing, the PCR Court opined that DiFrisco's defense team's performance met constitutional standards. This appeal ensued.

## II

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic,* 466 *U.S.* 648, 653, 104 *S.Ct.* 2039, 2043, 80 *L.Ed.*2d 657, 664 (1984). The United States Supreme Court has repeatedly recognized that in the absence of counsel, "the right to a trial itself would be 'of little avail.'" *Ibid.* (quoting *Powell v. Alabama,* 287 *U.S.* 45, 69, 53 *S.Ct.* 55, 64, 77 *L.Ed.* 158, 170 (1932)).

Both the federal and the New Jersey Constitutions guarantee not only a right to counsel, but also a right to "the effective assistance of counsel." *Cronic, supra,* 466 *U.S.* at 654, 104 *S.Ct.* at 2044, 80 *L.Ed.*2d at 664 (quoting *McMann v. Richardson,* 397 *U.S.* 759, 771 n. 14, 90 *S.Ct.* 1441, 1449, 25 *L.Ed.*2d 763, 773 (1970)); *see also State v. Sugar,* 84 *N.J.* 1, 17, 417 *A.*2d 474 (1980) ("Because the Constitution requires the assistance of counsel and not merely his physical presence, counsel must be effective as well as available."). Those constitutional guarantees recognize that "the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty." *Johnson v. Zerbst,* 304 *U.S.* 458, 462–63, 58 *S.Ct.* 1019, 1022, 82 *L.Ed.* 1461, 1465 (1938); *Sugar, supra,* 84 *N.J.* at 16, 417 *A.*2d 474. Consequently, the assistance of counsel "is essential to insuring fairness and due process in criminal proceedings." *Sugar, supra,* 84 *N.J.* at 16, 417 *A.*2d 474.

The majority has set forth the appropriate standard for an ineffective assistance of counsel claim under *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and

*State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). *Ante* at 218–19, 804 *A.*2d 520–21. In *Strickland,* the United States Supreme Court announced a two-prong test for evaluating claims of ineffective assistance of counsel under the Sixth Amendment. First, counsel's performance must fall "below an objective standard of reasonableness." *Id.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. Second, the prejudice prong requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

There is, of course, no specific set of rules for judging reasonable performance. *Strickland, supra,* 466 *U.S.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694; *Fritz supra,* 105 *N.J.* at 52, 519 *A.*2d 336. Instead, "[I]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. *See also State v. Savage,* 120 *N.J.* 594, 617, 577 *A.*2d 455 (1990) (noting that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."). As a general matter, "client loyalty, adequate consultation, and legal proficiency are relevant in determining whether assistance was effective." *Fritz, supra,* 105 *N.J.* at 52, 519 *A.*2d 336.

"The duty to investigate is part of a defendant's right to reasonably competent counsel. 'The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel.'" *Harris v. Blodgett,* 853 *F.Supp.* 1239, 1255 (1994) (quoting *United States v. Tucker,* 716 *F.*2d 576, 583 n. 16 (9th Cir.1983); *McQueen v. Swenson,* 498 *F.*2d 207, 217–18 (8th Cir.1974)); *Williams v. Taylor,* 529 *U.S.* 362, 120 *S.Ct.* 1495, 146 *L.Ed.*2d 389, (2000); *Mayfield v. Woodford,* 270 *F.*3d 915, (9th Cir.2001) (*en banc*); *Coleman v. Mitchell,* 268 *F.*3d 417, 449 (6th Cir.2001); *Ainsworth v. Woodford,* 268 *F.*3d 868 (9th Cir.2001); *Jermyn v. Horn,* 266 *F.*3d 257, 312 (3d Cir.2001); *Carter v. Bell,* 218 *F.*3d 581, 596 (6th

Cir.2000); *Smith v. Stewart*, 189 *F*.3d 1004, 1008 (9th Cir.1999); *Berryman v. Morton*, 100 *F*.3d 1089, 1101 (3d Cir.1996); *Hendricks v. Calderon*, 70 *F*.3d 1032, 1043 (9th Cir.1995); *Workman v. Tate*, 957 *F*.2d 1339, 1345 (6th Cir.1992); *Kenley v. Armontrout*, 937 *F*.2d 1298, 1309 (8th Cir.1991).

Courts also have found deficient performance where counsel failed to hire and call appropriate expert witnesses. *Mayfield, supra*, 270 *F*.3d at 927; *Lockett v. Anderson*, 230 *F*.3d 695, 716 (5th Cir.2000); *Jackson v. Calderon*, 211 *F*.3d 1148, 1163 (9th Cir.2000); *Caro v. Calderon*, 165 *F*.3d 1223, 1227 (9th Cir.), *cert. denied*, 527 *U.S.* 1049, 119 *S.Ct.* 2414, 144 *L.Ed.*2d 811 (1999); *United States v. Tarricone*, 996 *F*.2d 1414, 1418–19 (2d Cir.1993); *Sims v. Livesay*, 970 *F*.2d 1575, 1580–81 (6th Cir.1992).

Performance has been deemed deficient where counsel failed to provide an expert with information that was critical to the expert's analysis. *Smith, supra*, 189 *F*.3d at 1112; *Wallace v. Stewart*, 184 *F*.3d 1112, 1118 (9th Cir.), *cert. denied*, 528 *U.S.* 1105, 120 *S.Ct.* 844, 145 *L.Ed.*2d 713 (2000); *Clabourne v. Lewis*, 64 *F*.3d 1373, 1385 (9th Cir.1995).

Although counsel's failure to present available evidence favorable to a defendant may not alone constitute deficient performance under the first prong of *Strickland/Fritz*, "an inadequate investigation of the law or fact ... dispels the presumption of competence that might otherwise arise from a strategic choice." *State v. Bey*, 161 *N.J.* 233, 252, 736 *A*.2d 469 (1999) (*Bey V*). If counsel's performance is shown to be deficient, then the inquiry turns to the second prong of *Strickland* analysis.

In *State v. Davis*, 116 *N.J.* 341, 356–57, 561 *A*.2d 1082 (1989), this Court rejected the notion that it should alter the ineffective assistance of counsel test for the guilt phase of a capital case, stating that the *Strickland/Fritz* test would "adequately fulfill the constitutional guarantee." However, when called on to apply *Strickland/Fritz* to a penalty-phase trial, the Court determined to alter the standard. In so doing, the Court noted that a literal application of the prejudice prong would force a reviewing court to

step into the shoes of the sentencing jurors. Recognizing that "a reviewing court strays from its traditional function if it attempts to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient," the Court propounded a new prejudice standard to better accommodate the "circumscribed appellate review function." *State v. Marshall,* 148 *N.J.* 89, 250, 690 *A.*2d 1 (1997) (*Marshall III*).

> In our view, an adaptation of the *Strickland/Fritz* prejudice test to capital-case penalty-phase proceedings that more faithfully reflects our appellate function would require courts to determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially.
>
> *[Ibid.]*

After announcing the new standard, the Court said: "The reasonable probability that ineffective assistance of counsel in the penalty phase of a capital trial substantially affected the jury's penalty-phase deliberations equates with a 'probability sufficient to undermine confidence in the outcome.'" *Ibid.* (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). Finally, the Court explained its reasoning for changing the prejudice standard for the sentencing phase of a capital trial:

> We regard our understanding of the *Strickland/Fritz* prejudice prong for reviewing claims of ineffective assistance of counsel in penalty-phase proceedings to be a necessary adaptation of the literal *Strickland* standard to the realistic limitations on appellate review of jury penalty-phase deliberations. Although an appellate court cannot predict the outcome of a penalty-phase jury's deliberations, it is entirely capable of assessing *whether the production of additional mitigating evidence would have been likely to have a substantial effect on the jury's deliberations.* We are satisfied that our adaptation of the *Strickland* prejudice prong to penalty-phase proceedings is faithful to the core meaning of the standard announced by the *Strickland* court.
>
> *[Id.* at 250–51, 690 *A.*2d 1 (emphasis added).]

Notwithstanding that Court's statement that the *Marshall III* standard "equates" with *Strickland,* it is clear that they are not the same. Otherwise the Court would not have felt compelled to modify the *Strickland/Fritz* standard. Clearly the meaning of "reasonable probability" is the same in both contexts. The difference is that *Marshall III* scrutinizes the process of the jury's deliberations, whereas the focus of *Strickland/Fritz* is on outcome.

The spotlight on process is consistent with the concern expressed by the United States Supreme Court, specific to the penalty phase of capital trials:

[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, *see Trop v. Dulles,* 356 *U.S.* [86], 100[, 78 *S.Ct.* 590 (1958) ] (plurality opinion),

requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

[*Woodson v. North Carolina,* 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976).]

More particularly,

[T]he determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability. Presumably the imposition of a death sentence is entrusted to a jury because it is a uniquely moral decision in which bright line rules have a limited place.

[*Hendricks, supra* 70 *F.*3d at 1044.]

In sum, if counsel's unprofessional performance compromised the process of the penalty proceeding by keeping from the jury information that, if presented, was reasonably probable to substantially affect the deliberative process, prejudice is established. *See, e.g., Smith, supra,* 189 *F.*3d at 1013; *Collier v. Turpin,* 177 *F.*3d 1184, 1202 (11th Cir.1999); *Glenn v. Tate,* 71 *F.*3d 1204, 1210–11 (6th Cir.1995); *Frey v. Fulcomer,* 974 *F.*2d 348, 358 (3rd Cir.1992).

That is the backdrop against which our analysis should proceed.

## III

There were essentially two narratives about DiFrisco that could be culled from the facts. As described by capital cause expert David Bruck, one was that he was a "self-indulgent, amoral and selfish individual who persistently chose the parasitic lifestyle of a chronic drug abuser, and who entered into a cold-blooded contractual arrangement with an organized crime figure to murder a stranger for money." The other was that he committed the

murder, not for the pittance he was paid, but because he was damaged by emotional and neurological impairments and long-term drug abuse that led him to fall under the spell of a father figure (Franciotti), and that he was truly remorseful for his actions. The former narrative cast DiFrisco as unregenerate; the latter, as capable of redemption. Whether DiFrisco's life would be saved depended in great measure on which of those narratives the jury believed.

From that perspective, it is clear that DiFrisco's defense team fell short of what is required of capital counsel and that the inadequate performance affected the jury's deliberative process.

## A. REMORSE

In a capital prosecution remorse always is a pivotal issue. *See* Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 *N.Y.U. L.Rev.* 26, 58–59 (2000) (noting that jurors who found a defendant remorseful also tended to see him as "likable as a person"); Stephen P. Garvey, *Aggravation and Mitigation on Capital Cases: What Do Jurors Think?* 98 *Colum. L.Rev.* 1538, 1560–61 (1998) (referring to statistical analysis that showed that jurors were more likely to vote for death if the defendant expressed no remorse for his offense and that "only the defendant's prior history of violent crime and future dangerousness were more aggravating than lack of remorse," in determining the jury's verdict); Theodore Eisenberg, Stephen P. Garvey, & Martin T. Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 *Cornell L.Rev.* 1599, 1633 (noting that statistical analysis demonstrated that "if jurors believed that the defendant was sorry for what he had done, they tended to sentence him to life imprisonment, not death"); Scott E. Sunby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 *Cornell L.Rev.* 1557, 1565 (1998) (stating that jurors reported that "if the defendant had made some showing of remorse they might have switched their votes from death to life" and that "in thirteen of the nineteen [cases studied in which the death penalty was imposed] at least one juror explicitly

insisted that he would have voted for life rather than death had the defendant shown remorse"); William S. Geimer and Anthony Amsterdam, *Why Jurors Vote for Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am. J.Crim. L.* 1, 39–40 (1987–88) (noting jurors report that defendant's demeanor, including "lack of remorse," was an operative factor in their decision to impose the death penalty in thirty-two percent of the cases examined, second in significance only to the manner of the killing).

At DiFrisco's first penalty trial that was conducted without a mitigation investigation, the court imposed the death penalty. Finding no evidence of remorse, on direct appeal the Court characterized the case as unique, in part because the defendant was so "remorseless." *DiFrisco I, supra,* 118 *N.J.* at 255, 571 *A.*2d 914.[5] At DiFrisco's second penalty trial, the defense offered two remorse-related mitigating factors—(1) that he confessed because of his remorse and (2) that he is presently remorseful.

The jury unanimously rejected the first mitigating factor and rejected the second by a vote of 11 to 1. That outcome is unsurprising because counsel essentially presented no evidence to undergird the idea of DiFrisco's remorse. In fact, at the close of the case, the trial court proposed striking the remorse mitigators altogether because there was no evidence to support them. Eventually, because defense counsel desperately argued that remorse was a lynchpin of their case, the Court allowed the mitigators to remain solely because the past confession was before the jury. How the PCR Court could have concluded that defense counsel's failure to present remorse evidence passed muster is difficult to comprehend.

---

[5] On Proportionality Review, this Court relied upon DiFrisco's lack of remorse in determining the pool of offenders against whom his death sentence should be compared and, as a result, in refusing to find his death sentence to be disproportionate. *State v. DiFrisco,* 142 *N.J.* 148, 204, 662 *A.*2d 442 (1995).

Had the defense not offered the two mitigating factors regarding remorse, the failure to present evidence might have been seen as a reasonable strategic choice. Or, if the defense had offered the mitigating factors regarding remorse and then presented some testimony to support them, that would have demonstrated a coherent strategy. Instead, the defense offered two mitigating factors about remorse, thereby drawing attention to the issue, and then presented no evidence to support them. It is impossible to justify ·the defense's course of action because their performance was not reasonable.

DiFrisco's counsel presented two supposed expert witnesses and four lay witnesses at the penalty retrial. Although they initially hired Silikovitz, who specialized in child sexual abuse and termination of parental rights, they did not use him as a witness. Silikovitz stated several times in his first report that DiFrisco was deeply remorseful for his crimes and that he wished to "undo all the really bad things" he had done. Silikovitz described him as a "sensitive individual" who is "capable of empathizing closely with the feelings and thought of others." Silikovitz also found that DiFrisco "does have a good sense of what is right and what is wrong, and he understands fully that specific crimes deserve specific consequences." In his second report, Silikovitz conveyed DiFrisco's remorse even more strongly, specifically describing his remorse for Potcher's family, a point the trial court found lacking in the first penalty phase. Silikovitz's second report observed that, over the five years since his crime, DiFrisco had given considerable thought "to the implications of his acts to the decedent's family and to society."

Given the errors made by Silikovitz in his diagnosis of DiFrisco and his general lack of knowledge about capital litigation, counsel's decision not to call him as a witness at the penalty trial was reasonable. The decision not to replace him, however, clearly was unreasonable. Once counsel determined that Silikovitz was a liability, it defied reason not to seek the opinion of a new psychological expert. If counsel determines that a particular expert's

report is deficient, but the area of investigation is significant to the mitigation case (which remorse obviously was), the duty to investigate requires further inquiry into the subject covered by the incompetent expert.

Significantly, defense counsel also failed to instruct Alfonso Associates to investigate remorse as a source of mitigation evidence. It goes without saying that when defense counsel hires a mitigation expert to evaluate the client, counsel remains responsible for management of the case and for monitoring and devising a coherent strategy. With respect to remorse, that did not occur.

The expert reports presented at the PCR hearing underscored the availability of remorse evidence. Dr. Alan Goldstein spent 26 hours with DiFrisco and administered a battery of psychological tests. Goldstein concluded that DiFrisco was remorseful:

> Mr. DiFrisco is, at times, preoccupied with the effects that his incarceration and his sentence have had upon his family, particularly his mother. He feels considerable guilt in not being available to help her, and at times, focuses on thoughts about her eventual death. Feelings of depression and remorse stem from his failure to take advantage of school and the effects drugs have had on his life. A considerable amount of remorse focuses on the killing of Edward Potcher: "I regret—taking a life." While such responses may be interpreted as self-serving, the consistency of such responses through the interviews and in other records suggests the genuineness of such feelings.

The "other records" referred to by Goldstein include DiFrisco's statement to the police upon his arrest, in which he spoke of his desire to "clean the slate" and his feeling "very sorry for killing" Potcher. Goldstein found DiFrisco's past and present expressions of remorse to be consistent and summarized his findings on the question of DiFrisco's remorse:

> Mr. DiFrisco acknowledges the significant role that drugs played in this crime and he recognizes the impairments and poor judgment that existed in his thinking at the time of the crime. However, while he acknowledges these newly found insights, it is clear that Mr. DiFrisco does not offer them as an "excuse" for his conduct. Rather, he recognizes the wrongfulness of his act; his feelings of shame and remorse are readily apparent ... According to Mr. DiFrisco, "If not for drugs ... [I] would not have committed a murder; never." The Petitioner was able to express empathy, stating "I have a family—I understand ... I did a terrible, terrible thing."

In his report, Goldstein explained the significance of his findings about DiFrisco's remorse in terms that would have been highly relevant to the jury's deliberations. He would have testified that DiFrisco's remorse and his insight into his past acts "significantly reduces the likelihood of future violent acting-out behavior."

The mitigation specialist retained by PCR counsel, Jill Miller, reported, based on her own observations and on numerous interviews with DiFrisco and Sister Elizabeth Gnam, a Catholic nun who worked with DiFrisco in her capacity as Chaplain of the New Jersey State Prison, that DiFrisco was sincerely remorseful. According to Miller's report, Sister Elizabeth:

> [c]onfirmed that she met with Petitioner about once a week during the time that he was in CSU, and somewhat less frequently when he was in general population from the spring of 1990 to spring, 1993. Sr. Elizabeth stated that she has had many individual sessions with Anthony over the years. In addition, she has conducted religious services on his unit. She reported that she always found Anthony to be very responsive, adding that he "Shared deeply and at length about the events of his life." Sr. Elizabeth noted that Anthony has always appeared to relate well to others; his overall adjustment at the prison has been good.

> Sr. Elizabeth reported that Anthony has talked with her about his actions in the offense. She believes that he is genuinely remorseful. Sr. Elizabeth stated that Anthony has grown more reflective over the years and has matured. He has reflected on his own actions, including his mistakes. She stated that, in contrast to many others she sees, Anthony has *always* accepted responsibility for his mistakes and clearly understands the wrongfulness of his actions.

Based on her own interactions with DiFrisco, Miller reported that, "[f]rom the time of the shooting forward, Anthony states that he knew he had done something terribly wrong. He felt guilty and remorseful." Miller's assessment of DiFrisco was consistent with Goldstein's assessment:

> Anthony's actions in reporting to his parole agent high on drugs could be viewed as a cry for help, to be stopped. His confession to the commission of a homicide, in order to avoid being charged with auto theft, indicates a possibility of the need to relieve his guilt about his actions and take responsibility, possibly both. His cooperation with authorities in providing details of the offense, waiving extradition and pleading guilty are further indicators of remorse, understanding of wrongfulness, and acceptance of responsibility.

> . . .

> There are a number of indicators of positive rehabilitative potential present on Anthony's part. Chief among these are the behaviors he displayed at the time of

his arrest in New York in the spring of 1987, and continuing to the time of his plea in January, 1988. His confession, waiver of extradition, cooperation with authorities, and guilty plea all indicate an acceptance of responsibility, remorse, and an understanding of the wrongfulness of his actions. Anthony has not, at any time in interviews with this author, projected blame for his actions on anyone else. He stated, "I knew (immediately) I did something terribly wrong ... I'm responsible 100%." He has exhibited a clear understanding of the wrongfulness of his conduct, and appears genuinely remorseful regarding the death of Edward Potcher.

The PCR court specifically recognized "the significance of remorse as mitigation in capital cases" and then inexplicably found that defense counsel had acted reasonably in their presentation of remorse. That decision is insupportable. First, as noted above, *no* evidence of present remorse was adduced. Second, there was ample available proof of DiFrisco's remorse that defense counsel overlooked. Third, the decision not to replace Silikovitz with a different psychological expert to present evidence of DiFrisco's remorse was totally inexcusable. Presumably, a competent replacement would not have reached Silikovitz's incorrect diagnosis that troubled Soto. It was thus unreasonable for counsel not to consult another expert. Indeed, the evidence adduced at the PCR hearing made clear that Soto's failure to replace Silikovitz with another expert occurred simply because she ran out of time and did not comprehend the terrible consequences of her decision. Although both Soto and Lapidus testified that they knew they needed a remorse witness, Soto decided not to call Silikovitz when she became lead counsel approximately six weeks before trial. Indeed, the remorse case was so thin that the trial court nearly dismissed it.

Because defense counsel's failure to present expert testimony on remorse cannot be viewed as the result of a strategic decision, it is not entitled to any deference whatsoever. *See Cooks v. Ward,* 165 *F.*3d 1283, 1295 (10th Cir.1998) (stating that where there is "no strategy, reasonable or otherwise, to explain" counsel's performance, no deference is warranted); *Baxter v. Thomas,* 45 *F.*3d 1501, 1513 (11th Cir.1995)(noting that if counsel's decision "was not tactical," court must proceed to prejudice inquiry); *Bey V, supra,* 161 *N.J.* at 251–52, 736 *A.*2d 469 ("An inadequate investiga-

tion of the law or fact, however, dispels the presumption of competence that might otherwise arise from a strategic choice."); *Savage, supra*, 120 *N.J.* at 622, 577 *A.*2d 455 (where counsel's failure to put on additional mitigating evidence does not reflect a reasonable decision that the client's interests would not be served by that evidence, reasonable performance will not be presumed).

Upon rejecting Silikovitz, defense counsel had a duty to either obtain the testimony of another psychologist, or, at the very least, to direct their mitigation specialists to explore and later testify about DiFrisco's remorse. *Wallace, supra*, 184 *F.*3d at 1117 ("'A lawyer who knows of but does not inform his expert witnesses about ... essential pieces of information going to the heart of the case for mitigation does not function as "counsel" under the Sixth Amendment.'"); *Smith, supra*, 189 *F.*3d at 1112 ("A lawyer who should have known but does not inform his expert witness about essential information going to the heart of the defendant's case for mitigation does not function as counsel, under the Sixth Amendment.").

In failing to present evidence to support the two mitigating factors based on remorse, defense counsel's actions were analogous to those of the attorney found to have been ineffective in *Savage:*

> Although defense counsel presented five mitigating factors—two specifically linked to defendant's mental state—he offered no expert testimony regarding defendant's mental state. In developing his case in mitigation, defense counsel failed to explore *obvious sources of information regarding defendant's background* and mental state, directly relevant to those five mitigating factors .... In sum, counsel provided the jury with little or no evidence to find any mitigating factor.
>
> [*Savage, supra*, 120 *N.J.* at 623–24, 577 *A.*2d 455.]

There really can be no serious dispute over whether defense counsel's actions prejudiced DiFrisco. Numerous courts have recognized the unique significance of remorse at the penalty phase of a capital trial. *See, e.g., Booker v. Dugger*, 922 *F.*2d 633, 635–36 (11th Cir.1991) (noting that instruction that precluded jurors from considering evidence of defendant's remorse not harmless); *Russell v. Lynaugh*, 892 *F.*2d 1205, 1215 (5th Cir.1989) (holding

evidence that defendant was "capable of remorse" to be relevant "to the question of future dangerousness"); *Delap v. Dugger*, 890 *F*.2d 285, 305 (11th Cir.1989)(instruction precluding jury's consideration of, *inter alia*, evidence of defendant's remorse, not harmless); *Magill v. Dugger*, 824 *F*.2d 879, 893–94 (11th Cir.1987) (holding error not harmless where evidence of remorse was excluded from jury's consideration); *cf. United States v. Page*, 2000 *WL* 343209, at *16 (N.D.Ill.2000) (additional mitigating evidence unlikely to change outcome of proceeding where defendant's testimony "bespoke a lack of contrition or remorse").

The majority's contrary conclusion suffers from a number of fundamental flaws. The first is its notion that because DiFrisco's crime was "calculating and brutal," the remorse evidence would not have made a difference. That analysis ignores that the crime is the point of departure in a mitigation case, not the determinant. More importantly, it flies directly in the face of what social science and judicial decisions have taught us about the power of remorse to sway juries. For remorse to be an effective mitigator, a defendant is not required to be "good." As the cases reveal, remorse has been considered ameliorative in situations involving brutality and cruelty that greatly exceeded DiFrisco's.

The majority is also wrong to justify defense counsel's failure to present evidence of DiFrisco's remorse on the ground that the remorse evidence carried with it negative information about DiFrisco. That determination not only belies our experience in capital jurisprudence, but also misconceives the Court's role in a case like this. Indeed, it is the rare capital murder case that does not present two-edged evidence. In the absence of a reasonable strategic decision to justify its omission—which is not even alleged here—such evidence should be weighed by the jury.

In short, defense counsel's failure to adduce evidence of DiFrisco's remorse, not only "fell below an objective standard of reasonableness," *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, but also unquestionably affected the jury's deliberations, thereby prejudicing DiFrisco under the standards of *Mar-*

*shall III. See Williams, supra,* 529 *U.S.* at 397, 120 *S.Ct.* at 1515, 146 *L.Ed.*2d at 420 (stating that lower court's determination that omitted mitigation evidence required reversal of death sentence appropriately "rested on his assessment of the totality of the omitted evidence"); *Jermyn, supra,* 266 *F.*3d at 309 (stating that defendant "can show prejudice in this case if there is a reasonable probability that the presentation of the specific and disturbing evidence of childhood abuse and neglect as a mitigating factor would have convinced one juror to find the mitigating factors to outweigh the single aggravating factor the Commonwealth relied upon in this case").

Had the jury heard the evidence adduced on the PCR petition, all of which was indisputably available to trial counsel, it is likely that it would have found the existence of the two mitigating factors submitted to it regarding remorse. Given the importance of remorse, it is also likely that the jurors would have attributed significant weight to those factors. It cannot fairly be said, therefore, that defense counsel's omissions were not reasonably probable to substantially affect the jury's deliberations. *See Savage, supra,* 120 *N.J.* at 623–24, 626, 577 *A.*2d 455 (holding that counsel's failure to produce evidence of defendant's diminished mental capacity, despite having submitted two mitigating factors to the jury "specifically linked to the defendant's mental state" was prejudicial).

## B. Cooperation

I am convinced as well that trial counsel's failure to pursue DiFrisco's cooperation with the state constituted ineffective assistance of counsel. By his confession, DiFrisco had already given himself up. The prosecutors wanted Franciotti. Although the State never offered a life sentence in exchange for DiFrisco's testimony before the Grand Jury, he still had much to gain from cooperating. Specifically, given trial counsel's plan to submit to the jury the mitigating factor that "the defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder," DiFrisco's cooperation, if attest-

ed to by the State, would have increased the chances that additional jurors would have found the existence of that important mitigating factor, or that the jury would have given it greater weight.

There was little evidence to support the cooperation mitigating factor because, although the prosecutor made efforts to obtain DiFrisco's cooperation, DeLuca steadfastly rejected those efforts unless death was taken off the table, and he led the prosecutor to believe that DiFrisco was not interested in cooperating in the absence of that condition. Even if DeLuca's actions passed muster as a negotiating tool at the early stages of the case, at the point at which he and his successors reached the court house steps, their refusal to explore the issue in the absence of a "bargain" for a life sentence was clearly ineffective assistance of counsel.

Indeed, on the morning of trial when the prosecutor again sought cooperation but refused a life sentence, DiFrisco had absolutely nothing to lose, and everything to gain, by cooperating. As the report of David I. Bruck explained, trial counsel's failure to pursue cooperation at that point reflected "inexperience" in capital defense, because "even an unsuccessful proffer would have strengthened Mr. DiFrisco's claim in mitigation that he had done everything possible to assist the state in prosecuting Mr. Franciotti." Had counsel been able to present to the jury additional evidence of cooperation, more than six jurors may have found the existence of that mitigating factor and accorded it significant weight.

In rejecting that claim, the PCR court incorrectly held that the record failed to support it, because "attorney DeLuca was not called to testify as a witness" at the PCR hearing. Of course, that ignored the uncontested evidence of DeLuca's correspondence with the State establishing his inflexible position with respect to DiFrisco's cooperation. More importantly, the PCR court ignored altogether that portion of the claim addressing DeLuca's successors' failure to pursue cooperation with the State even as they prepared for the penalty retrial.

It is true, as the majority points out, that DiFrisco stated that he did not want to be known as a "snitch." However, that is a far cry from a refusal to cooperate. Notably no member of the defense team testified at the PCR hearing that DiFrisco, in fact, refused to cooperate, and his letter seeking removal of DeLuca as counsel specifically stated the contrary. The testimony at the hearing focused on DeLuca's attitude. Nothing in the record eliminated the obligation of DiFrisco's counsel to strongly advise his cooperation in order to enhance his mitigation case, especially because he had absolutely nothing to lose by agreeing to cooperate.

In ruling out cooperation with the State because the "bargain" of a life sentence had not been offered, defense counsel provided constitutionally ineffective assistance of counsel.

## C. Cumulative Error

Even if none of the individual omissions of trial counsel standing alone was sufficiently grievous to require a finding of ineffective assistance of counsel, when considered in the aggregate, the missteps in this case cumulatively cry out for a remedy. As noted, no evidence of remorse was adduced despite the fact that two remorse mitigators were before the jury. It is not surprising that the jury rejected them 12–0 and 11–1. Second, DiFrisco's counsel refused to pursue cooperation with the prosecutor despite advancing a cooperation mitigator. Third, the defense team totally abdicated its responsibility to secure a competent psychological evaluation that not only could have affected the jury's overall view of DiFrisco's character, but also could have impacted the jury's impression of whether his ability to exercise sound judgment was impaired, a notion eight of the jurors rejected. Without psychological evidence documenting DiFrisco's emotional and neurological impairments, the chance of presenting a true picture of his relationship with Franciotti was radically diminished. Fourth, by substituting Albarus for Alfonso, in spite of her lack of factual knowledge, professional training, and credentials, DiFrisco's entire

mitigation investigation and presentation, as poor as it was, was essentially eviscerated.

Contrary to the conclusions of the PCR court, the evidence proffered at the PCR hearing was different in quality and quantity from the defense case presented at trial. Indeed, it is impossible to review the facts in this case without realizing that a persuasive case for life could have been advanced on behalf of DiFrisco but was not. Given that the jury found only a single aggravator, there is a more than reasonable probability that its deliberations would have been substantially affected by the wealth of mitigating evidence adduced at the PCR hearing but omitted due to cumulative error by defense counsel. That evidence clearly supported the narrative about DiFrisco that could have saved his life.

In reaching an opposite conclusion, both the PCR Court and the majority overstepped their bounds, weighing the PCR evidence instead of simply focusing on its nature and its potential to substantially affect the deliberative process. Had the lens been properly directed, there is no question but that a new penalty phase trial, at which the jury could be fully informed, should have been ordered.

## IV

Finally, DiFrisco contends that the death penalty is unconstitutional. For the reasons I expressed in *State v. Koskovich*, 168 *N.J.* 448, 776 *A.*2d 144 (2001), and more recently in *State v. Josephs*, 174 *N.J.* 44, 803 *A.*2d 1074 (2002), I would revisit *State v. Ramseur*, 106 *N.J.* 123, 174, 524 *A.*2d 188 (1987), in light of the changes in the public's appetite for capital punishment that have developed in the fifteen years since it was decided. In my view,

It is time for this Court to reevaluate the state's death penalty statute. We can no longer ignore the fact that the so-called justifications in favor of the death penalty have withered and that a consensus is growing—not only at home, but across the country and around the world—that the death penalty is unfair, unjust and incompatible with present standards of decency. In light of present day realities, *Ramseur* must be revisited and, in the interim, a moratorium must be imposed on the use of the extreme and irreversible sanction of death.

[*Koskovich, supra,* 168 *N.J.* at 581, 776 *A.*2d 144 (Long, J., concurring in part and dissenting in part) ].

## V

Traditionally, we have prided ourselves on the quality of defense representation in capital cases in New Jersey. In a disappointing decision that undercuts the reliability of the capital jurisprudence over which we have labored, the majority today sanctions the imposition of the death penalty in a case in which defense counsel "entirely failed[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic, supra,* 466 *U.S.* at 659, 104 *S.Ct.* at 2047, 80 *L.Ed.*2d at 668. I cannot agree to such a conclusion and, therefore, I dissent.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO and LaVECCHIA—4.

*For reversal*—Justices STEIN, LONG and ZAZZALI—3.